**Robert WALLACE, Plaintiff–Appellee,**

**v.**

**Craig BENWARE, Defendant–Appellant.**

**No. 94–3498.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1995.

Decided Oct. 13, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 27, 1995.

Terry L. Moore (argued), Stephanie L. Finn, Herrick, Hart, Duchemin & Danielson, Eau Claire, WI, for Plaintiff–Appellee.

Joel L. Aberg (argued), Weld, Riley, Prenn & Ricci, Eau Claire, WI, for Defendant–Appellant.

Before POSNER, Chief Judge, and BAUER and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Robert Wallace brought this action under 42 U.S.C. § 1983 against the Sheriff of Polk County Wisconsin, Craig Benware, alleging that Benware violated his First Amendment rights when he engaged in a campaign of retaliatory harassment after Wallace announced that he would run against Benware in an upcoming election. During and after his unsuccessful campaign, Wallace remained a full-time deputy sheriff and retained most of his former responsibilities. Wallace maintains, however, that Benware retaliated by subjecting him to a series of harassing incidents designed to chill his First Amendment rights. The jury found that Benware's retaliatory actions violated the Constitution and awarded Wallace $15,000 in punitive damages. The district court entered judgment on the jury's verdict but reduced the damages awarded to $5,000. In this appeal, Benware argues that a line of this circuit's decisions authorize the actions that he as sheriff took against a politically disloyal deputy. He contends that under those decisions, he is entitled either to judgment as a matter of law or to qualified immunity. Benware also challenges the sufficiency of the evidence to support the jury's liability finding and its award of punitive damages. For the reasons that follow, we find that Benware violated Wallace's rights

under the First Amendment but that he is entitled to qualified immunity.[1] We therefore reverse the judgment below.

## I.  BACKGROUND

Wallace was hired as a full-time deputy sheriff of the Polk County, Wisconsin Sheriff's Department in the summer of 1990. Prior to that, Wallace had worked during the summer months on the department's boat patrol, which patrolled Polk County's lakes and waterways. Wallace's primary responsibility when hired as a full-time deputy sheriff was the implementation of a "D.A.R.E." program, which is an educational program for fifth and sixth grade students addressed to the hazards of drug use.[2] As the department's D.A.R.E. program coordinator, Wallace taught D.A.R.E. classes during the school year at various schools within Polk County. During the summer months, Wallace continued his work on the boat patrol and had other patrol responsibilities. Wallace received nothing but accolades for his performance during his first two years as a full-time deputy sheriff, and Benware conceded at trial that Wallace had done an exemplary job in implementing the department's D.A.R.E. program.

On June 4, 1992, Wallace publicly announced his candidacy for the office of Polk County Sheriff, and after that announcement and in the course of the campaign, Benware's attitude toward him changed appreciably. First, Benware refused to speak with Wallace for approximately ninety days. Wallace and other witnesses, including Benware's own chief deputy, testified at trial that Benware also began to subtly harass Wallace. That campaign of harassment is the subject of Wallace's section 1983 claim, as he maintains that the harassment was prompted solely by political speech during the cam-

---

1. As explained, *infra*, we unanimously agree that Wallace established a violation of his First Amendment rights. Chief Judge Posner and Judge Bauer believe that Benware is nonetheless entitled to qualified immunity, and for this reason, a majority of the panel has voted to reverse the judgment in Wallace's favor. I believe, however, that Wallace's right under the First Amend-

ment to be free from retaliatory harassment was clearly established when Benware acted. I would therefore deny the immunity defense and affirm the judgment below.

2. "D.A.R.E." stands for "Drug Abuse Resistance Education."

paign that was protected under the First Amendment.

Benware's most immediate reaction to Wallace's candidacy was to remove him from the department's boat patrol. Benware made that decision only one week after Wallace had released campaign literature highlighting his more than ten years of experience with the boat patrol, and despite Wallace's status as the department's only certified marine patrol officer.

Benware then undertook a series of actions that generally made life as a deputy sheriff more difficult for Wallace. For instance, like all other patrol officers, Wallace had been assigned a portable radio that enabled him to maintain contact with a dispatcher when he was away from his squad car. Yet Benware soon ordered Wallace to leave his radio at the office, although at the time, there were anywhere between one and five functioning spare radios available at the office for use by other deputies. No other full-time deputy was asked to leave his portable radio behind when performing patrol duties. Moreover, prior to June 1992, Wallace's squad car had been equipped with a radar unit, which again was consistent with his patrol responsibilities. During that summer, however, Wallace's radar unit malfunctioned and was sent away for repairs. In the interim, Wallace obtained the permission of Chief Deputy Sheriff Steven Moe to use the radar unit kept in the department's spare squad car. But when Benware learned of this, he ordered the unit returned and required Wallace to operate his vehicle without a radar unit. Once Wallace's own radar unit was repaired, it was not returned to him but was used instead by Benware for his own vehicle. Benware testified at trial that nearly every deputy who had patrol responsibilities was assigned a radar unit for his squad car. He conceded, moreover, that Wallace had been assigned patrol responsibilities during the summer of 1992.

Similarly, during his first two years as a full-time deputy sheriff, Wallace had been permitted to keep his squad car on his off-duty days. This was consistent with the department's general practice at the time. During the summer of 1992, however, Ben-ware ordered Wallace to leave his squad car at the office on weekends. This required Wallace to unload his vehicle each Friday afternoon and to have an on-duty deputy drive him the thirty-five miles to his home, thereby taking the on-duty deputy away from his other law enforcement responsibilities. On Monday morning, then, on-duty deputies would again make the trek to Wallace's home to drop off his squad car. Only one other full-time deputy was required to leave his squad car at the office on off-duty days, and that deputy vocally supported Wallace's campaign. After Wallace had been chauffeured back and forth in this way for approximately three weeks, Benware rescinded his order and allowed Wallace to again retain his squad car on off-duty days.

Benware's conduct after June 1992 also hampered Wallace's ability to fulfill his D.A.R.E. responsibilities. During that summer, Wallace ordered materials necessary for his upcoming D.A.R.E. classes. Wallace had routinely placed such orders in the past, and Benware had routinely approved them, as the cost of the D.A.R.E. materials was relatively minor. This time, however, Benware instructed Moe not to order the D.A.R.E. materials Wallace had requested. When Wallace questioned Moe once the materials did not arrive, Moe told him to speak with Benware directly. Wallace did so, and Benware said only that "I will speak to you when I feel like speaking to you." Wallace was therefore required to begin his D.A.R.E. classes without any of the program materials. It eventually became apparent to Wallace that Benware did not intend to approve his purchase order, and Wallace then was able to obtain the necessary materials from a D.A.R.E. instructor employed by the National Parks Service. Benware admitted at trial to directing Moe not to order Wallace's D.A.R.E. materials, knowing full well that the materials were necessary for Wallace to carry out his assigned responsibilities as a D.A.R.E. program instructor.

Moreover, each semester during his first two years as a D.A.R.E. instructor, Wallace had sent a letter to the parents of participating students explaining the purpose of the program. The letter was necessary, he be-

lieved, because parents might raise questions with a school district about the presence of a deputy sheriff in the classroom. Benware had been aware of Wallace's practice and had never questioned the letter's propriety. In the late summer or early fall of 1992, however, when Wallace was prepared to distribute his customary letter, Benware would not approve it, explaining only that he would "do it when he felt like doing it." The participating school districts became anxious for Wallace to send the letter, which forced Wallace to explain that Sheriff Benware was withholding his approval. Each school district responded by transferring one of Wallace's earlier letters to its own letterhead and distributing the letter to parents of participating students.

Finally, Wallace previously had been active in a number of other events that were related to the department's D.A.R.E. program. For example, he would speak to student groups on the dangers of drug use and participate in fundraisers. After Wallace became a candidate for sheriff, however, the members of the department no longer informed him of such events, even if a school district or other event organizer had specifically requested his presence. Benware instead would direct some other deputy sheriff to cover the event.

Wallace also described at trial a particular situation in which what he considered to be retaliatory harassment potentially endangered his life. Near the end of a shift in February 1993, Wallace was one of the first deputies to respond to the dispatcher's report of a situation involving an armed individual who had taken at least one hostage inside a home. Wallace and another officer were sent in to scout out the situation, and as they moved in, shots were fired from the house. Additional officers soon arrived and secured the perimeter of the house. Wallace and two other deputies were then designated as the entry team, meaning that they would establish a position close to the house and would enter the house if that became necessary. Wallace and his colleagues crawled through the snow to establish their positions. They concealed themselves behind stationary

objects, and their proximity to the home required that they remain concealed. Otherwise, Wallace testified, the perpetrator would "have an easy shot" at them. Once the three were in position, Wallace acted as the cover man, as only he among the three was armed with a rifle. After some time,[3] Benware arrived on the scene and ordered that Wallace be relieved. When those instructions were relayed to the entry team by portable radio, Wallace and another deputy questioned the appropriateness of removing Wallace from his concealed position, given the risk that he might be shot. It was ultimately decided that moving Wallace would jeopardize his own safety as well as the safety of the remaining members of the entry team. Wallace was therefore not relieved from his position. Benware maintained at trial that he had sought to relieve Wallace because Wallace had been on duty for an extended period of time and required relief. The evidence at trial established, however, that when Benware issued the order, at least four other deputies on the site of the hostage situation had been working on that date as long or longer than Wallace, but Wallace was the only deputy Benware sought to relieve.

Finally, during the summer of 1993, when school was not in session and Wallace was not teaching D.A.R.E. classes, he was given a series of cleaning assignments. He was told to clean three stalls in a garage, an evidence room that had not been cleaned for approximately thirty years, a training room, and a shed. These janitorial duties were not in the job description of a patrol deputy, were not generally assigned to full-time deputy sheriffs, and had never before been assigned to Wallace.

Wallace complained to individuals within the Sheriff's Department and within his union about the treatment he was receiving from Benware. He invariably was told that nothing could be done. When it became clear to Wallace that the harassment would continue indefinitely, he resigned his position with the Polk County Sheriff's Department on December 12, 1993. He filed the instant lawsuit in Wisconsin state court, and Ben-

---

3. The hostage situation lasted approximately seven hours.

ware subsequently removed the case to a federal forum.

After the district court denied Benware's motion for summary judgment, the case proceeded to a bifurcated trial before a jury. In response to special interrogatories, the jury found in the liability phase that Wallace's campaign for the position of Polk County Sheriff had been a substantial or motivating factor behind Benware's campaign of petty harassment and that Benware would not have taken the same actions absent Wallace's election campaign. (R. 46.) After a separate damages trial, the same jury found that Wallace had sustained no compensable damages, but it awarded him $15,000 in punitive damages. (R. 50.) The district court subsequently denied Benware's motion for judgment as a matter of law or for a new trial, but it reduced the jury's punitive damage award to $5,000, explaining that the larger award was disproportionate to the duration and extent of the constitutional deprivation Wallace had suffered. The district court entered judgment on the remitted verdict and also awarded Wallace attorney's fees and costs.

## II. DISCUSSION

### A.

Benware's primary argument on appeal is based on our decision in *Upton v. Thompson,* 930 F.2d 1209 (7th Cir.1991), *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992), and its progeny. Benware maintains that under the principles enunciated in *Upton,* he is entitled to judgment as a matter of law on Wallace's First Amendment claim.

In the two cases consolidated in *Upton,* we considered the First Amendment claims of deputy sheriffs who had been dismissed for actively supporting unsuccessful candidates in the prior election. *Id.* at 1210–11. In determining whether the policymaker exception to the First Amendment's ban on patronage dismissals (*see Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547

(1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980)), would apply to deputy sheriffs in Illinois, we considered " 'whether [political considerations] can be an appropriate requirement for the effective performance' of a deputy sheriff's duties." *Upton,* 930 F.2d at 1218 (quoting *Livas v. Petka,* 711 F.2d 798, 800 (7th Cir. 1983)). Because we found deputy sheriffs in Illinois to "operate with a sufficient level of autonomy and discretionary authority," we believed it appropriate for a sheriff to use political considerations in determining who would serve in that capacity. *Id.* at 1218. We therefore concluded that a sheriff in Illinois does not violate the First Amendment when he dismisses a deputy solely for political reasons. *Id.*

We have since applied the *Upton* doctrine to related factual circumstances in a series of cases. In the first of those cases, we applied *Upton* to the dismissal of a deputy who had remained neutral during the incumbent sheriff's re-election bid. *See Dimmig v. Wahl,* 983 F.2d 86, 87 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 176, 126 L.Ed.2d 135 (1993). Over Judge Eschbach's dissent, the *Dimmig* majority held that because a sheriff could decide that a politically neutral deputy might "hinder the effective performance of the department," the Constitution permits the sheriff to discharge the deputy for refusing to campaign on his behalf. *Id.*[4] We subsequently held in *Wilbur v. Mahan,* 3 F.3d 214 (7th Cir.1993), that a sheriff did not violate the First Amendment when he required a deputy belonging to his own political party to take an unpaid leave of absence after the deputy announced his intention to run against the sheriff in an upcoming election. An elected official such as a county sheriff, we explained, "is entitled to insist on the loyalty of his policymaking subordinates, and a declaration that the subordinate means to run against the official at the next election is the height of disloyalty." *Id.* at 218–19.

---

4. In dissent, Judge Eschbach found that this carried the *Upton* doctrine too far: "A sheriff may now use *Upton* as a tool to compel speech in the form of political activity from his deputies. A

result that permits speech to be compelled is strongly repugnant to First Amendment jurisprudence." *Id.* at 88.

In *Heideman v. Wirsing,* 7 F.3d 659 (7th Cir.1993), moreover, we applied *Upton* to the dismissal of a deputy sheriff employed by a county in the State of Wisconsin.[5] Prior to his termination, Heideman had supported another deputy who was running against the incumbent sheriff. On the night before the election, Heideman became involved in a heated argument at a bar over the two candidates for sheriff. After the incumbent sheriff was re-elected, he suspended Heideman and initiated an investigation of the bar incident. That investigation culminated in Heideman's dismissal. *Id.* at 660–61. The deputy maintained that his termination violated the First Amendment because the bar incident involved protected political speech. We rejected that argument, however, concluding that under the "broad reach" of *Upton,* the deputy's dismissal was merely another instance of a sheriff using political considerations to determine who would serve as a deputy. *Id.* at 664.

Finally, in *Mitchell v. Thompson,* 18 F.3d 425 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 191, 130 L.Ed.2d 124 (1994), we addressed the First Amendment claim of a deputy sheriff who had been demoted for remaining neutral and refusing to support the incumbent sheriff's re-election campaign. In finding that the sheriff was entitled to qualified immunity, we observed that under our earlier patronage decisions, "the law did not clearly forbid [the sheriff] from either firing a deputy, or taking the lesser step of demoting one, for political purposes." *Id.* at 427.[6]

Benware maintains that under these decisions he too is entitled either to judgment as a matter of law, or at the very least to qualified immunity. He argues that *Upton* and its progeny effectively insulate a sheriff from liability under section 1983 not only for politically motivated dismissals and demotions, but also for *any* employment action that reasonably could be characterized as adverse. In other words, it is Benware's position that the *Upton* line of cases authorizes a sheriff to engage in a campaign of retaliatory harassment once a deputy decides to challenge him in an election campaign. Wallace has two responses. First, he argues that Benware waived reliance on our patronage decisions when he failed to raise that argument until after the jury returned its verdict. Alternatively, Wallace acknowledges that under *Upton* and its progeny, Benware could have dismissed or demoted him, but he contends that our patronage decisions do not apply to Benware's conduct here because the sheriff chose to retain a politically disloyal deputy but to retaliate against him through a campaign of petty harassment.

### B.

█ We must first consider whether Benware properly preserved his reliance on our patronage decisions, as the district court agreed with Wallace that he had not. In denying Benware's motion for judgment as a matter of law, the court emphasized that at no point prior to the jury's verdict had Benware asked the court to decide whether his actions were covered by *Upton* and its progeny. (R. 64 at 4–5.)[7] The court explained that Benware had pursued the defense that Wallace's political speech was not a substantial factor in any of the challenged employment decisions and never argued that Wallace's speech was unprotected under our patronage decisions. The court would not permit Benware to alter his course after an adverse jury verdict and to argue that under *Upton,* he was entitled to retaliate against a political opponent. (*Id.* at 5.)

---

5. Wallace argued in his brief that *Upton* and its progeny apply only to deputy sheriffs in Illinois because this court has never determined that Wisconsin deputy sheriffs also hold policymaking positions. (Wallace Br. at 17.) He retreated from that position at oral argument, however, conceding that our *Heideman* decision extends the rule of *Upton* to Wisconsin deputy sheriffs.

6. Judge Harlington Wood, Jr., filed a dissent in *Mitchell* and urged the court to reexamine its recent political patronage precedents insofar as they relate to politically neutral law enforcement officers. *See id.* at 428 (Wood, J., dissenting).

7. The court's opinion explained that Benware did not raise this issue until 2:10 p.m. on July 28, 1994. (*Id.* at 5.) The jury returned its verdict in the liability phase of the case on July 25, 1994, and awarded punitive damages the following day.

■ Our review of the record, however, reveals a fundamental flaw in the district court's waiver analysis. The court believed that Benware first raised the patronage issue only after the jury had returned its verdict, and the court found this too late. Although the parties' briefs were less than clear on this important point, Benware's counsel assured us at oral argument that he had argued our patronage decisions to the district court in his motion for judgment as a matter of law before the case was submitted to the jury. The record bears out counsel's assertion, as it includes a written motion for judgment as a matter of law under Fed.R.Civ.P. 50(a) and a lengthy supporting memorandum addressing the *Upton* issue. (*See* R. 43 & 44.) Those documents are dated July 25, 1994, although they are stamped as having been filed in the district court on July 28. The original motion and memorandum, however, include a handwritten notation in the upper right hand corner indicating that they were received by the district court's clerk on July 25, 1994 at 2:10 p.m., before the liability phase of the case was submitted to the jury. Indeed, the trial transcript establishes that Benware's counsel made his motion and then argued the patronage decisions to the court before the jury began its deliberations. (*See* Tr. vol. I at 6, 115–16, 146–53, 155–57.) Although a defense based on our patronage decisions could certainly have been raised earlier in the proceedings, that defense was properly preserved when raised in a Rule 50(a) motion at the close of all the evidence.[8]

### C.

Having decided that Benware properly preserved reliance on our patronage deci-sions, we must determine whether those decisions encompass the campaign of retaliatory harassment found by the jury here. The district court distinguished *Upton* and its progeny on the ground that Benware had not dismissed or demoted Wallace after the deputy announced his candidacy, nor had Benware placed Wallace on unpaid leave. (R. 64, at 5.) Each of those responses to Wallace's political speech would have been permissible under the First Amendment even if it may have violated the terms of a collective bargaining agreement that governed the conditions of Wallace's employment. *See, e.g., Mitchell,* 18 F.3d at 427 (deputy demoted); *Wilbur,* 3 F.3d at 217–19 (deputy placed on unpaid leave); *Upton,* 930 F.2d at 1218 (deputy dismissed). What was not permissible, under the district court's analysis, was Benware's decision to retain Wallace as a deputy sheriff with most of his former responsibilities but to retaliate against him through a campaign of petty harassment.

We have permitted a sheriff to dismiss or demote a politically disloyal deputy under the theory that once elected to public office, a sheriff should be entitled to place in the policymaking position of deputy sheriff loyal and trustworthy individuals who would be most effective in carrying out his electoral mandate. *See Upton,* 930 F.2d at 1215–16; *see also Dimmig,* 983 F.2d at 87; *Livas,* 711 F.2d at 801. Our overriding concern has been with the effectiveness and efficiency of the Sheriff's Department, and toward that end, we have perceived no constitutional impediment to a sheriff's decision to dismiss from a policymaking position "persons who are not his political friends and [who] may be his political enemies." *Wilbur,* 3 F.3d at

---

8. The district court's waiver analysis also was influenced by the fact that Benware had not attempted to show at trial that Wallace's campaign disrupted the efficient operation of the Sheriff's Department. The court believed that absent such a showing, Benware was foreclosed from arguing in a motion for judgment as a matter of law that his interest in promoting an effective and efficient Sheriff's Department outweighed Wallace's right to speak on a matter of public concern under the balancing test of *Pickering v. Board of Educ. of Township High Sch. Dist.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). (R. 64, at 4–5, 6–7.) We do not agree, however, that an actual disruption of the affected department need be shown in these circumstances. Once a confidential or policy-making employee announces that he intends to challenge his superior in an upcoming election, we presume that the deputy's candidacy will engender such enmity that the sheriff is entitled to fire the deputy without showing that the deputy would be unable to serve the sheriff loyally and competently. *Wilbur,* 3 F.3d at 216, 218–19. The question presented by this appeal is therefore not whether Wallace's candidacy may have disrupted the effective operation of the Sheriff's Department, but whether the sheriff's response to the presumed disruption was appropriate under the First Amendment.

217–18; *see also Warzon v. Drew,* 60 F.3d 1234, 1238–39 (7th Cir.1995). As we explained in *Heideman,* the policymaker exception to the First Amendment's ban on patronage dismissals recognized by the Supreme Court in *Elrod v. Burns,* 427 U.S. at 367–68, 96 S.Ct. at 2686–87, and *Branti v. Finkel,* 445 U.S. at 517, 100 S.Ct. at 1294, "embrace[s] the notion that retaliation in response to political beliefs and political associations, which are typically manifested in the electoral process, may be warranted if the free expression poses a threat to the efficient conduct of a public office because the employees' position requires political loyalty." 7 F.3d at 662. Thus, the dismissal or demotion of a deputy who challenged the sheriff in an election withstands a First Amendment challenge only because we presume that the sheriff's action is directed toward the efficient and effective operation of his public office. *See Wilbur,* 3 F.3d at 217–18; *cf. Elrod,* 427 U.S. at 362, 96 S.Ct. at 2684 (only *governmental* interest will justify suppression of speech).

We do not believe, however, that the rationale of those decisions that authorize a sheriff to dismiss or demote a politically disloyal deputy can be extended to Benware's campaign of retaliatory harassment. Although we presume that a deputy's dismissal is aimed at serving the public interest in efficient and effective government, it would be illogical to apply the same presumption to harassment designed specifically to hinder or to disrupt a deputy in the performance of his duties. And we believe that is a fair characterization of what the record shows here. The evidence at trial established that Benware's treatment of Wallace did not serve to enhance the efficiency and effectiveness of the Polk County Sheriff's Department. Indeed, it apparently was Benware's purpose to make it more difficult for Wallace to do his job. For example, after Wallace announced his candidacy, Benware did not relieve him of his primary responsibility as the department's D.A.R.E. program coordinator; he instead made it more difficult for Wallace to effectively perform that assignment by refusing to order the necessary instructional materials or to authorize Wallace's annual letter to the parents of program participants. In addition to that, Benware terminated all communication with Wallace and simply refused to speak with him. Benware also did not relieve Wallace of his patrol responsibilities; he instead made fulfillment of those responsibilities more difficult, and perhaps more dangerous, by requiring that Wallace work without a portable radio or a radar unit. The evidence at trial established that Benware did not require any other full-time deputy sheriff with patrol responsibilities to work under similar constraints. Moreover, no other full-time deputy sheriff (except a deputy who had supported Wallace's campaign) was required to leave his squad car at the office on off-duty days. Benware's directive in that regard not only made it more difficult for Wallace to do his job, but also hindered the ability of other deputies to fulfill their law enforcement responsibilities, as on-duty deputies were required to transport Wallace back and forth to his home. Finally, because Benware did not relieve Wallace of his patrol responsibilities, Wallace became involved in a potentially dangerous hostage situation, and even the most charitable reading of the record reveals that Benware attempted to relieve Wallace from that duty in circumstances that may well have endangered his life and the lives of other officers.

Of course, Benware offered explanations at trial for all the challenged actions and attempted to show that his decisions represented the legitimate exercise of his authority as sheriff over departmental and personnel matters, but the jury rejected those explanations and found that Benware had acted primarily to retaliate against Wallace for his political campaign. It is not within our province to second-guess that verdict, as it was based on the jury's assessment of the credibility of this drama's two major players. The jury's decision to believe Wallace and not Benware was reasonable, and its verdict was amply supported by the trial evidence. *See Perry v. Larson,* 794 F.2d 279, 283–84 (7th Cir.1986).

Unlike the circumstances of any other case in the *Upton* line, however, Wallace's employment here was governed by a collective bargaining agreement (the "CBA"), which prevented his dismissal without good cause. Benware's brief does not focus on this fact,

but because Wallace's candidacy did not constitute good cause for his dismissal under the CBA, Benware's actions could be interpreted as an attempt to constructively discharge his politically disloyal deputy in circumstances where a direct dismissal would violate the CBA. Under that interpretation of the facts, one might question why a constructive discharge violates the First Amendment when a direct dismissal would not. As we explained above, however, *Upton* is an application of the policymaker exception to the Constitution's ban on patronage dismissals. Although the purpose of that exception—to promote the public interest by enhancing the effectiveness and efficiency of a unit of local government—may be served by the deputy's dismissal, it is not served by a campaign of petty harassment that generally makes it more difficult for the deputy to do his job, even if the ultimate goal of that harassment is to prompt the deputy's resignation. In other words, our approval of retaliatory dismissals that advance the public interest does not confer upon the sheriff a right to achieve that dismissal by means that have the effect of harming the public's interest in effective government. We refuse to expand the scope of the policymaker exception to cover conduct inimical to its purpose simply to circumvent the decision of a particular locale to protect its deputy sheriffs from summary dismissal either under the terms of a collective bargaining agreement or a legislative ordinance. *Cf. Heideman,* 7 F.3d at 663–64 (only probationary deputy not covered by terms of collective bargaining agreement subject to patronage dismissal).

### D.

### 1.

Benware maintains that even if he is not entitled to judgment as a matter of law under *Upton* and its progeny, he at least should be granted qualified immunity because it was not clearly established in June 1992 that a sheriff would violate the First Amendment if he engaged in a campaign of retaliatory harassment against a politically disloyal deputy. *See Mitchell,* 18 F.3d at 426. My col-

leagues agree with Benware. Although they join me in holding that the sheriff's conduct violated the First Amendment, they do not believe that the principles enunciated above were sufficiently established in June 1992 so as to deprive Benware of qualified immunity. Because this is the first case to hold that a sheriff's decision to harass a policymaking employee on political grounds is actionable under the First Amendment even if the sheriff could have fired the employee, my colleagues believe that Benware is entitled to qualified immunity. In their view, the distinction we draw between dismissing and harassing a policymaking employee is a subtle one, and a plaintiff cannot overcome a public officer's claim to immunity with a subtle distinction. My colleagues have therefore decided to reverse the judgment below and to direct the district court to enter judgment for Benware on the basis of qualified immunity. I disagree with their conclusion in that regard, and will explain in the next section of this opinion, which speaks for me alone, why I would deny Benware's immunity defense and affirm the district court's judgment.

### 2.

In my view, the analysis of the immunity issue must begin with *Bart v. Telford,* 677 F.2d 622 (7th Cir.1982). We held there that a campaign of petty harassment in response to views expressed during a political campaign is actionable under section 1983 as a violation of the First Amendment. We reaffirmed that holding seven years later in *Pieczynski v. Duffy,* 875 F.2d 1331, 1333 (7th Cir.1989), explaining that:

> Harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs. The harassment need not be so severe as to amount to constructive discharge—that is, it need not force the employee to quit, by making work unbearable.

(citations omitted).[9] We also held that the defendants in *Pieczynski* were not immune

---

**9.** We explained in *Bart* that whether or not the

harassment was sufficiently severe to give rise to

from the plaintiff's claim of harassment because our decision in *Bart* should have put them on notice that a campaign of petty harassment in response to political speech is actionable as a violation of the First Amendment. *Id.* at 1335–36; *see also Dahm v. Flynn*, 60 F.3d 253, 258–59 (7th Cir.1994) (rejecting claim to qualified immunity if public employee engaged in campaign of harassment).

Benware argues, however, and my colleagues agree, that the principle of *Bart* and *Pieczynski* did not clearly establish that harassment of a *policymaking employee* would be actionable under the First Amendment. But our decision in *Bart* does not distinguish between policymakers and other public employees. Indeed, it is not readily apparent that the plaintiff in *Bart* was not in fact a policymaking employee. We know from the opinion only that she worked in a department of city government that was directly supervised by the mayor. 677 F.2d at 623–24. By relying here on the fact that Wallace was a policymaking employee, Benware and my colleagues invoke an *exception* to the general rule that patronage dismissals violate the First Amendment. *See Branti*, 445 U.S. at 517, 100 S.Ct. at 1294; *Elrod*, 427 U.S. at 367–68, 96 S.Ct. at 2686–87. That exception was necessary, the Supreme Court believed, to protect the public's interest in efficient and effective government. In crafting that exception, the Court did not address harassment of a policymaker, but its rationale for exempting a policymaker's *dismissal* suggests that harassment would not be covered by the exception. Our decision in *Upton* merely applied the policymaker exception to the *dismissal* of a deputy sheriff, as we held that deputy sheriffs are policymaking employees under *Elrod* and *Branti*. *See Upton*, 930 F.2d at 1218. *Upton*, too, said nothing about harassment, but again, the purpose for the policymaker exception to the First Amendment's ban on patronage *dismissals* that we applied in *Upton* would not be served by a campaign of petty harassment. Because *Upton* addressed only the retaliatory dismissal of a policymaking employee and did not attempt to bring a campaign of harass-

ment within the scope of the policymaker exception, it did not affect the law that was clearly established in this circuit by *Bart* and *Pieczynski*.

■ In applying the doctrine of qualified immunity, we must look to what a reasonable public official would have understood from existing law (*see Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)), and our cases do not require that there be a prior case on all fours on both the facts and the law. *See, e.g., Knox v. McGinnis*, 998 F.2d 1405, 1410 (7th Cir.1993). Instead, a defendant is not entitled to immunity if the unlawfulness of his actions was apparent in light of existing law. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. In contrast to my colleagues, I believe that test is satisfied here. *Bart* clearly established the law applicable to claims of petty harassment, and a reasonable sheriff should therefore have understood in 1992 that harassing a deputy sheriff in retaliation for political speech would violate the First Amendment. Our subsequent decision in *Upton* had no effect on the clearly established law of *Bart*, as that decision applied only to the retaliatory *dismissal* of a deputy sheriff, and I believe that a reasonable public official would not have understood otherwise in 1992. In my view, we should not require that an existing case actually decline to extend an *exception* to clearly established law before we deny a claim to qualified immunity. For these reasons, I would reject Benware's immunity defense and affirm the judgment below.

## III. CONCLUSION

Although under this circuit's decisions, Benware was entitled to dismiss or demote a politically disloyal deputy like Wallace, those decisions do not exempt from First Amendment scrutiny the campaign of retaliatory harassment Wallace endured here. The evidence at trial fully supports the jury's finding that Benware's campaign of harassment violated Wallace's First Amendment rights. Yet because the majority of this panel finds that Benware was nonetheless entitled to

liability under section 1983 is a question of fact.

677 F.2d at 625. The jury here found that it was.

qualified immunity, we reverse the district court's judgment and remand with instructions that judgment be entered for the defendant.

REVERSED AND REMANDED.