# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-2948

_____

Jeanette McKee

*Plaintiff - Appellee*

Susan Hickman

*Plaintiff*

Sharon Rebecca Hickman

*Plaintiff - Appellee*

v.

Michael Reuter, in his individual capacity; Christy Scrivner, in her individual capacity

*Defendants - Appellants*

Teresa Cusick

*Defendant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: November 26, 2018
Filed: January 8, 2019
[Unpublished]

_____

Before HARTZ, BALDOCK, and HOLMES, Circuit Judges.[*]

_____

HOLMES, Circuit Judge.

Jeanette McKee and Sharon Rebecca Hickman brought First Amendment political patronage claims under [42 U.S.C. § 1983](#) against Michael Reuter, the Republican elected clerk of the Circuit Court of Jefferson County, Missouri, and his subordinate, Christy Scrivner. After dismissing some claims, the district court[1] denied Mr. Reuter and Ms. Scrivner summary judgment based on qualified immunity. They appealed, and exercising jurisdiction under [28 U.S.C. § 1291](#), we affirm the denial of qualified immunity.

I

*A. Jeanette McKee*

Ms. McKee began working for the Circuit Court of Jefferson County, Missouri in 1989. In 1998, she became the chief deputy clerk. In 2014, she was both the highest ranking and the highest paid deputy clerk, and she was nominated to run as the Democratic candidate to replace the outgoing clerk of court. Her opponent in the general election was Mr. Reuter, the Republican candidate. During the course of the campaign, Ms. McKee publicly commented that Mr. Reuter had been accused of domestic violence. Although he later acknowledged he was arrested for domestic violence and his wife obtained a temporary protective order against him, he indicated that no charges were ever filed. Mr. Reuter won the election and took office on January 2, 2015.

_____

[*] The Honorable Harris L. Hartz, the Honorable Bobby R. Baldock, and the Honorable Jerome A. Holmes, United States Court of Appeals for the Tenth Circuit, sitting by intercircuit designation.

[1] The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

-2-

On Mr. Reuter's first day on the job, he and his wife, Renee Reuter, were present when Ms. McKee arrived at work. Before Ms. McKee removed her coat, Mr. Reuter instructed her to relocate her work station from her semi-private desk to a cubicle immediately outside his office. Mr. Reuter assured her that her duties would remain the same, meaning she would still be the chief deputy clerk. But the next day, he directed Ms. McKee to tend the front counter and answer telephones while he convened a meeting of all the deputy clerks, of whom there were approximately 53. At the meeting, Mr. Reuter announced that Ms. Scrivner, who had no relevant experience, would be the chief deputy clerk, not Ms. McKee. Mr. Reuter held another meeting of supervisors immediately afterwards and again excluded Ms. McKee. On Mr. Reuter's third day as clerk, he directed Ms. McKee to surrender her office keys and parking pass because she was no longer the chief deputy clerk. At some point, he also installed two security cameras in the office. By the end of Mr. Reuter's second week in office, Ms. McKee was on medical leave.

Ms. McKee returned from medical leave in early February 2015. When she returned, Mr. Reuter issued her a notice of corrective action "for (1) failure or refusal to comply with a lawful order and to accept a reasonable and proper assignment from an authorized supervisor; (2) documented inefficiency, incompetence, negligence [. . .] in the performance of duties; and (3) behavior that adversely affects the court or the employees' ability to perform assigned duties." Aplt. App. at 257. The notice indicated that Mr. Reuter received a complaint from Ms. Scrivner, who claimed that Ms. McKee refused to help update forms and notify attorneys about time-sensitive materials. The notice stated that Ms. McKee's attitude was creating "a hostile work environment," *id.*, and that if she was "unable to obey [Mr. Reuter's] orders or perform [her] job duties," she would be subject to disciplinary action, including dismissal, *id.* at 258. The notice also informed Ms. McKee that she would be meeting with Mr. Reuter monthly "to assess [her] progress in resolving these issues." *Id.*

-3-

Ms. McKee contested the notice of corrective action by filing a formal grievance with Mr. Reuter. She denied the allegations and asserted the "corrective action was politically motivated." *Id.* at 261. She requested that it be withdrawn in its entirety, stating that she had never had corrective action taken against her and that Mr. Reuter and Ms. Scrivner were intentionally impeding her ability to do her job:

> You and [Ms. Scrivner] have prevented me from doing my job responsibilities on a daily basis by excluding me from meetings and email notices that ALL other employees received. You have disabled several computer program functions . . . without informing me as to why; or that a change was being made to my daily job responsibilities. You have humiliated me and singled me out by not including me in staff meetings where all staff were invited, but told me, "I was not needed", [sic] while other subordinate employees listened and witnessed as you informed me loudly as employees were walking by. You have taken me out of any supervisory or managerial position within the office.

*Id.* at 260. Additionally, Ms. McKee asserted that Ms. Scrivner was purposefully making her working conditions intolerable:

> The hostile work environment is created by Christy Scrivner. She has refused to talk to me or ask me any questions. She has told other employees that it is uncomfortable for me, which I've never said. She stood at the front counter and read the [news]paper article involving a personal matter between her and my husband on Thursday, January 29th where she also made threatening comments. Christy stated, "It's really hard for her to keep her mouth shut she would rather kick some ass". [sic]. She then made reference to her father being a good shot as she witnessed him shoot her dog between the eyes . . . . This behavior should not be tolerated and causes stress, harassment and a hostile work environment.

*Id.* at 259.

Mr. Reuter referred the grievance to an outside fact-finder, Paul Maddock, an attorney who previously worked with Mrs. Reuter. While Mr. Maddock investigated the grievance, Mr. Reuter reassigned Ms. McKee to an entirely new position in an isolated, windowless office doing microfilm tasks. On February 24, 2015, Mr. Maddock issued his report in which he "reluctantly recommend[ed]" that the notice of corrective action be withdrawn. *Id.* at 272. Mr. Reuter accepted Mr. Maddock's recommendation, withdrew the notice of corrective action, and eventually allowed Ms. McKee to return to her desk.

Then on April 2, 2015, Ms. McKee was involved in an argument with several other employees about office gossip. As a result, Mr. Reuter notified Ms. McKee that he intended to terminate her employment for six separate incidents, all of which transpired during the single argument. He had her escorted from the courthouse, and Ms. Scrivner wrote the word "karma" on a bulletin board outside her office, *id.* at 199-200. Ms. McKee contested her termination with Mr. Reuter, but after a hearing he upheld the dismissal. She appealed to the court's presiding judge, who referred the matter to a state-wide budget committee, which, in turn, appointed a three-judge panel from outside counties. After a lengthy hearing, the panel overturned Mr. Reuter's decision and reinstated Ms. McKee with backpay.

Ms. McKee returned to work in June 2015 and was assigned to the traffic division. Her position required that she perform tasks considerably below her qualifications. Mr. Reuter also instructed Ms. McKee's new supervisor, Teresa Cusick, that Ms. McKee should not enter the second floor, where the main clerk's office was located. Given these circumstances and her past experiences, Ms. McKee resigned.

*B. Sharon Rebecca Hickman*

Ms. Hickman was a deputy clerk and a Democrat who supported Ms. McKee during the 2014 campaign. When Mr. Reuter took office, Ms. Hickman had been

employed in the clerk's office support division for four years and had no negative performance evaluations. In July 2015, Mr. Reuter transferred her to the traffic division, where she was supervised by Ms. Cusick. Ms. Hickman was anticipating surgery and repeatedly asked Mr. Reuter to transfer her back out of the traffic division because she was in pain, but he refused.

During her tenure in the traffic division, Ms. Cusick warned Ms. Hickman that she would probably lose her job. Ms. Cusick told Ms. Hickman that she was "stupid," that she had a "mental handicap," and that she "would never learn the job." Aplt. App. at 217. Ms. Cusick would also ask Ms. Hickman, "[D]o you have to stand so close to me?" and "Do you have to be in my [] area?" *Id.* at 214. According to Ms. Hickman, she was not "trained consistently" and "was never taking classes, like other people got chances to," but instead, she was "thrown into a department and . . . sat with someone for about a week." *Id.* at 213. Ms. Hickman explained that her training was deficient because she had been trained by someone who had been employed in the traffic division for many years, but it would have been more helpful if she had been trained by a different employee who had more recently gone through the process. Ms. Hickman believed that Ms. Cusick added to the confusion by giving her conflicting instructions, sometimes telling her to answer the phone and go to the window and other times telling her not to answer the phone and not to go to the window. Ms. Hickman complained to Mr. Reuter that Ms. Cusick was mistreating her and inadequately training her—while Ms. Scrivner was present—but Mr. Reuter did not act. Instead, he told her to "go home, relax, [and] have a good weekend." *Id.* at 217. Notwithstanding these comments, he instituted monthly performance reviews by which Ms. Cusick repeatedly documented negative appraisals of Ms. Hickman's work. Ms. Cusick eventually recommended that Ms. Hickman be terminated or transferred to another department. Mr. Reuter terminated Ms. Hickman on October 13, 2015.

As Ms. McKee had done, Ms. Hickman contested her termination with Mr. Reuter. He upheld his decision, so she appealed to the presiding judge, who referred the matter to the budget committee, which appointed an outside three-judge panel. After a hearing, the panel overruled Mr. Reuter's decision and reinstated Ms. Hickman with backpay. Mr. Reuter subsequently initiated a lawsuit challenging the panel's decision. Although he initially prevailed in that suit, Ms. Hickman appealed to the Missouri Court Appeals, which reversed and upheld the lower panel's decision to reinstate her with backpay. *See Reuter v. Hickman*, No. WD81632, 2018 WL 5913107, at *5 (Mo. Ct. App. Nov. 13, 2018).

Meanwhile, Ms. Hickman returned to work, underwent surgery, and afterwards notified Mr. Reuter, Ms. Cusick, and Ms. Scrivner that she was in a lot of pain and that she was taking pain medication. She requested to be restricted to light duty, but Ms. Cusick told her "she didn't need to know about [her] medical history." *Id.* at 238. Ms. Scrivner asked whether she "was having problems doing [her] job," *id.*, while Mr. Reuter did not respond at all. Ms. Hickman suffered a nervous breakdown and went on medical leave. During her absence, Mr. Reuter informed her that an *en banc* panel of judges authorized her to take unpaid extended leave if she faxed in a written request. Ms. Hickman faxed her request, and Ms. Scrivner confirmed that she received it. But on October 5, 2016, Ms. Scrivner told Ms. Hickman that her request was not dated, so she needed to return to work the next day or she would lose her job. Ms. Hickman resigned.

II

Based on these events, Ms. McKee and Ms. Hickman filed an amended complaint under 42 U.S.C. § 1983, naming as defendants Mr. Reuter, Mrs. Reuter, Ms. Scrivner, Ms. Cusick, and Jefferson County, Missouri.[2] Ms. McKee and Ms. Hickman claimed defendants violated their First Amendment rights by taking

---

[2] A third deputy clerk, Susan Hickman, was a plaintiff, but the district court dismissed some of her claims and granted summary judgment on the rest.

adverse employment action against them on account of their political affiliations and activities during the 2014 campaign. The district court dismissed several claims under Federal Rule of Civil Procedure 12(b)(6), leaving Ms. McKee's claims against Mr. Reuter and Ms. Scrivner, and also leaving Ms. Hickman's claims against Mr. Reuter, Ms. Scrivner, and Ms. Cusick. Following discovery, these defendants moved for summary judgment based on qualified immunity.

The district court granted qualified immunity on Ms. Hickman's claim against Ms. Cusick, ruling there was no evidence she intended to terminate Ms. Hickman based on her political affiliation. Rather, the court observed, Ms. Cusick's recommendation to transfer or terminate Ms. Hickman was based on her alleged poor job performance. The court cited Ms. Cusick's affidavit indicating that Ms. Hickman issued arrest warrants for the wrong people, failed to issue warrants in a timely fashion and as directed, failed to check her office mail for one month, and otherwise displayed neglect, incompetence, and poor performance. The court pointed out that Ms. Hickman did not dispute these negative averments regarding her performance but merely denied remembering them and acknowledged that she made some mistakes due to poor training.

The court further concluded that Ms. Hickman's only evidence against Ms. Scrivner was (1) she was present when Ms. Hickman complained about Ms. Cusick's mistreatment to Mr. Reuter and (2) Ms. Scrivner falsely told Ms. Hickman that her request for extended medical leave was complete when it was not. The court determined these circumstances failed to establish a constitutional violation.

The court denied qualified immunity, however, on Ms. Hickman's claim against Mr. Reuter, as well as Ms. McKee's claims against Mr. Reuter and Ms. Scrivner. The court determined the law governing these claims was clearly established and the facts, accepted in the light most favorable to Ms. McKee and

-8-

Ms. Hickman, were sufficient to show a constitutional violation.[3]  Mr. Reuter and Ms. Scrivner subsequently brought this interlocutory appeal to challenge the denial of qualified immunity.

### III

"We review a denial of summary judgment on the grounds of qualified immunity de novo." *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014).  We have jurisdiction over the denial of summary judgment based on qualified immunity when the "interlocutory appeal[] reaches only to issues of law." *Ferguson v. Short*, 840 F.3d 508, 511 (8th Cir. 2016).  In evaluating the denial of qualified immunity, we ask "(1) whether the facts taken in the light most favorable to [the plaintiffs] make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the alleged violation." *Thompson v. City of Monticello*, 894 F.3d 993, 998 (8th Cir. 2018).  "Our review is thus limited to determining whether all of the conduct that the district court deemed sufficiently supported for purposes of summary judgment violated the plaintiff[s'] clearly established federal rights." *Id. at 997-98* (internal quotation marks omitted).

It is clearly established that the practice of political patronage, in which "public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party," "unquestionably inhibits protected belief and association." *Elrod v. Burns*, 427 U.S. 347, 359 (1976).  Political patronage dismissals unconstitutionally infringe on First Amendment rights of speech and association "unless 'the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.'" *Langley v. Hot Spring Cty.*, 393 F.3d 814, 817 (8th Cir. 2005) (quoting *Branti v. Finkel*, 445 U.S. 507, 518 (1980)).  Such positions usually involve "policy-making or a confidential relationship with an elected official." *Id.*; *see Barnes v.*

---

[3] The court also denied summary judgment on the merits of these claims, but those issues are not before us.

*Bosley*, 745 F.2d 501, 505 (8th Cir. 1984) (explaining that under *Elrod*, "the governmental interest in effectiveness and efficiency is only seriously threatened when an employee with an opposition party viewpoint is in a policymaking and confidential position").

An employee's political affiliation need not be "the sole motivating factor behind the . . . dismissal[]." *Barnes*, 745 F.2d at 507. "In 'mixed-motive' cases, where the evidence demonstrates that both legitimate and illegitimate motives may have prompted action against a public employee who engaged in protected conduct, the allocation of the burden of proof is dictated by *Mt. Healthy City School District Board of Education v. Doyal*, 429 U.S. 274 (1977)." *Barnes*, 745 F.2d at 507; *accord Mahn v. Jefferson Cty.*, 891 F.3d 1093, 1097 (8th Cir. 2018) (recognizing inconsistent Eighth Circuit authority on whether *Mt. Healthy* or *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs, but following *Mt. Healthy*). Under that analysis, the plaintiff must produce "sufficient evidence from which the fact finder reasonably can infer that the plaintiff's protected conduct was a 'substantial' or 'motivating' factor behind her dismissal." *Wagner v. Jones*, 664 F.3d 259, 270 (8th Cir. 2011) (internal quotation marks omitted). "If the plaintiff meets this burden, summary judgment must be denied unless the defendant establishes *either* that the political motive is an appropriate requirement for the job, *or* that the dismissal was made for mixed motives and the plaintiff would have been discharged in any event." *Mahn*, 891 F.3d at 1096 (internal quotation marks omitted); *see also Wagner*, 664 F.3d at 270-73 (applying *Mt. Healthy* in the context of qualified immunity analysis).

### A. *McKee v. Reuter*

Ms. McKee has marshalled enough evidence for a jury to reasonably infer that her political affiliation and activities during the 2014 campaign were substantial factors, both in the way Mr. Reuter treated her after the election and in his decision to dismiss her. They ran as opposing political candidates in a partisan campaign. On his first day in office, with his wife present, he directed Ms. McKee to relocate her

work station from a semi-private desk to a cubicle immediately outside his office, where he installed two security cameras. The next day, he replaced her with Ms. Scrivner, who had no relevant qualifications. He announced this personnel change at a meeting in which Ms. McKee was the only deputy clerk excluded, despite her status as the highest ranking, highest paid deputy clerk, and despite his assurance she would remain the chief deputy clerk.

Mr. Reuter also demanded Ms. McKee's office keys and parking pass, and when she returned from medical leave, he issued a notice of corrective action, ostensibly based solely on Ms. Scrivner's complaint, although Ms. McKee disputed it as politically motivated. In the notice, Mr. Reuter faulted Ms. McKee for creating a hostile work environment, threatened her with sanctions, and placed her on a monthly evaluation schedule, all without soliciting any input from her. While these justifications were evaluated by Mr. Maddock, who was a prior associate of Mrs. Reuter, Mr. Reuter assigned Ms. McKee to menial work in an isolated office. He withdrew the notice only after Mr. Maddock advised him to do so. And after the gossip argument, he terminated her and had her escorted from the courthouse. This evidence is sufficient for a rational factfinder to infer that Mr. Reuter mistreated and terminated Ms. McKee on account of her political affiliation and activities during the 2014 campaign.

Defendants offer two principal justifications—one legal and one factual—for Mr. Reuter's actions. The legal argument relies on *Carver v. Dennis*, 104 F.3d 847, 848 (6th Cir. 1997), where a deputy county clerk was terminated by her boss, who was the county clerk, a day after the deputy clerk announced she was challenging her boss in the next election. The Sixth Circuit, noting there was no evidence the deputy clerk was dismissed for her political beliefs, observed that the record instead indicated that the deputy clerk was fired for her *candidacy*. *Id.* at 850. Accordingly, the court distinguished the *Elrod/Branti* line of cases and held there was no First Amendment "right to express one's political views through candidacy." *Id.* at

-11-

850-51.  The court reasoned that to find a First Amendment violation under the facts of that case "would be to read out of the entire line of relevant Supreme Court precedent the factual requirements of political belief, expression and affiliation, partisan political activity, or expression of opinion, and to read into that precedent a fundamental right to candidacy."  *Id.* at 853.  Based on *Carver*, defendants contend that Ms. McKee had no First Amendment right to run for clerk of court and then, after losing the election, retain her position.

We do not dispute that there is no clearly established First Amendment right to run for office.  As defendants correctly point out, *Carver* makes clear there is not.  Consequently, to the extent any of Ms. McKee's claims are predicated solely upon her candidacy, defendants were entitled to qualified immunity.  But as we understand Ms. McKee's claims, they are not predicated upon her candidacy; they are predicated upon her affiliation with the Democratic party, the expression of her political views, and the activities she undertook as a Democrat during a partisan campaign, which fall squarely within the protections of the First Amendment.  *See id.*

Defendants insist that "virtually all of the applicable case law" holds that there is no First Amendment right to remain on the staff of a prevailing political opponent.  Reply Br. at 10 (citing *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982)).  But that is an overbroad characterization of the legal issue we confront here.  Our task is to determine whether, absent political affiliation being an appropriate requirement for the job, there is a First Amendment right not to be removed from a prevailing opponent's staff because of one's political affiliation.  There is indeed such a right.  *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) ("[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless political affiliation is an appropriate requirement for the position involved.").  *Bart* does not suggest otherwise.  In that case, a subordinate of the mayor announced that she intended to run for mayor.  677 F.2d at 623-24.  The mayor required that the

employee take a leave of absence, and when she returned to work after having lost the race, she alleged the mayor subjected her to harassment for having run for office. *Id.* at 624. The Seventh Circuit affirmed dismissal of the complaint to the extent it alleged the compelled leave of absence violated the employee's First Amendment rights, holding that the First Amendment does not confer a right to run for office. *Id.* But to the extent the complaint alleged harassment motivated by the employee's expression of her political views, the Seventh Circuit reversed, holding "that is all that is necessary to save this part of the complaint from being dismissed." *Id.* at 625. We think *Bart* illustrates the distinction between this case and *Carver*, which explicitly recognized that harassment based on political views can raise a constitutional violation, even if the victim was also a candidate. *See Carver*, 104 F.3d at 852.

As for whether political affiliation was an appropriate requirement for the job, defendants cite no evidence and offer no argument from which we might conclude that the chief deputy clerk was a policymaking or confidential position. Instead, defendants cite *Wallace v. Benware*, 67 F.3d 655, 661 (7th Cir. 1995), for the proposition that an employer—in that case, a sheriff—may dismiss or demote a deputy who challenged him in an election without violating the First Amendment. *Wallace* is inapposite, however, because underlying its entire disposition, which we discuss more fully below, is the recognition that deputy sheriffs are policymaking employees—a showing that has not been made here. *See id.* at 659 (explaining that deputy sheriffs fall under the policymaker exception to the First Amendment's ban on patronage dismissals); *id.* at 661 ("We have permitted a sheriff to dismiss or demote a politically disloyal deputy under the theory that once elected to public office, a sheriff should be entitled to place in *the policymaking position of deputy sheriff* loyal and trustworthy individuals who would be most effective in carrying out his electoral mandate." (emphasis added)). Absent any showing that the chief deputy clerk was a policymaking or confidential position, *Wallace* is legally inapplicable.

Moreover, even if *Wallace* were relevant—that is, even if, like *Wallace*, political affiliation was a requirement of the chief deputy clerk's job—*Wallace* does not hold that a losing party's involvement in an election gives the prevailing party unbridled latitude to harass his opponent. *Wallace* observed that "a deputy who challenged the sheriff in an election withstands a First Amendment challenge only because we presume that the sheriff's action is directed toward the efficient and effective operation of his public office." *Id.* at 662. As the court explained, "it would be illogical to apply the same presumption to harassment designed specifically to hinder or to disrupt a deputy in the performance of his duties." *Id.* Defendants fail to explicate how *Wallace* supports their position here, where the evidence could be construed to suggest that, rather than promote the efficiency and effectiveness of the court, Mr. Reuter instead harassed and impeded Ms. McKee in the performance of her duties by needlessly relocating her work station, distracting her with security cameras, taking her keys and parking pass, issuing her a politically motivated notice of corrective action based on a disputed complaint, retaining his wife's former associate as a fact-finder to adjudicate her grievance, isolating her to perform menial work, and reassigning her old duties to a new hire with no relevant qualifications.

Turning to defendants' factual justification, which presumably is their *Mt. Healthy* defense, they contend that Ms. McKee was fired for her outburst during the office-gossip argument. Defendants assert that Mr. Reuter, as the duly elected clerk, had both the discretion and the authority to discipline his deputy clerks. His office, however, did not give him license to violate clearly established constitutional rights. Because Ms. McKee has come forward with sufficient evidence that political animus was a substantial or motivating factor in her treatment and dismissal, defendants must demonstrate "that the record would compel a reasonable jury to find that the adverse action *would have occurred anyway*," *Mahn*, 891 F.3d at 1097 (ellipsis and internal quotation marks omitted). Defendants cannot make this showing because the outside panel of judges who heard Ms. McKee's appeal reinstated her with backpay. Moreover, defendants make no effort to justify any of the other

-14-

treatment she experienced, including her reassignment to the traffic division following her reinstatement, none of which were ostensible consequences of the office-gossip argument.

Defendants nevertheless offer one last fact in support of qualified immunity. They point out that ultimately neither Mr. Reuter nor Ms. Scrivner fired Ms. McKee; rather, she voluntarily quit. *See* Aplt. Br. at 19. But defendants do not contend that Ms. McKee cannot show she was constructively discharged. *See Jones v. Fitzgerald, 285 F.3d 705, 715-16 (8th Cir. 2002)* (recognizing that constructive discharge, which may be based on political retaliation, requires a plaintiff to establish that "defendants deliberately made or allowed her working conditions to become so intolerable that the employee had *no other choice* but to quit"). Instead, defendants reassert that she had no right to remain on the staff and avoid being assigned to the traffic division. We have already rejected that contention, and thus, the district court properly denied qualified immunity on Ms. McKee's claim against Mr. Reuter.

### B. McKee v. Scrivner

Our preceding discussion applies, as well, to Ms. McKee's claim against Ms. Scrivner. We reiterate that to the extent Ms. McKee's claims are based on her candidacy, defendants were entitled to qualified immunity. Again, however, we do not understand that to be the basis for her claims. Consequently, having rejected defendants' arguments, we have little difficulty concluding that a rational jury could infer that Ms. Scrivner's conduct was politically motivated. Plaintiffs alleged that Ms. Scrivner assisted Mr. Reuter in making their working conditions intolerable in exchange for her appointment to the chief deputy clerk position. Ms. Scrivner testified that she owned a pizza parlor and hosted Mr. Reuter's campaign, perhaps multiple times. She testified that she marched in a parade to support Mr. Reuter's wife in her bid for county counselor, and although she could not recall, she may have marched for Mr. Reuter's campaign as well. She did recall, however, wearing a t-shirt that said "Reuter" on it, Aplt. App. at 413, displaying a yard-sign that said

-15-

"Reuter" on it, *id.* at 415, and handing out flyers at an election poll station while thanking voters for their support of Mr. Reuter during the 2014 campaign.

After Mr. Reuter won the election, Ms. Scrivner took Ms. McKee's job as chief deputy clerk, despite acknowledging she had no relevant experience, had never been in a courthouse, and did not know what it meant to be a deputy clerk. *See id.* at 421 (Scrivner Depo.) ("I—I didn't know anything about how this office ran. I've never—was never in a courthouse, was never—so I didn't know what deputy clerk even actually meant."). Within days of assuming her new role, Ms. Scrivner lodged a complaint with Mr. Reuter against Ms. McKee. That complaint resulted in the notice of corrective action—Ms. McKee's first in some twenty-five years of service. Ms. McKee responded that the notice was politically motivated, that Ms. Scrivner was making threatening comments, and that both Ms. Scrivner and Mr. Reuter were impeding her ability to do her job by excluding her from meetings and emails, disabling her computer programs, and humiliating her in front of other employees. *See id.* at 259-61 (McKee grievance alleging the notice was "politically motivated," Ms. Scrivner was creating a "hostile work environment," and Mr. Reuter and Ms. Scrivner had "prevented [her] from doing [her] job responsibilities on a daily basis by excluding [her] from meetings and email notices that ALL other employees received[,] disabl[ing] several computer program functions[, and] humiliat[ing her]"). Mr. Reuter withdrew the corrective action, but when he fired Ms. McKee, Ms. Scrivner wrote the word "karma" on the board outside her office, which another employee understood to mean "that Mr. Reuter and . . . Christy Scrivner, were singling out people who had supported Jeanette McKee in the campaign," *id.* at 203. All this evidence could allow a rational jury to reasonably infer that political animus was a substantial or motivating factor behind Ms. Scrivner's conduct. And Ms. Scrivner has not argued that she was just following orders, as opposed to acting against Ms. McKee for her own reasons. Because defendants advance no further argument, we conclude the district court properly denied qualified immunity on Ms. McKee's claim against Ms. Scrivner.

-16-

*C. Hickman v. Reuter*

Finally, defendants dispute the denial of qualified immunity on Ms. Hickman's claim against Mr. Reuter. They contend the evidence shows Ms. Hickman was fired not because she is a Democrat and supported Ms. McKee, but because she was incompetent. They point out that Ms. Hickman issued arrest warrants for the wrong people, issued warrants untimely and not as directed, failed to check her mail for a month, and repeatedly showed neglect, incompetence, and poor judgment. But the evidence also shows that Ms. Hickman had been employed for four years and had never received a negative performance evaluation. It was not until after Mr. Reuter, a Republican, was elected in a campaign in which Ms. Hickman supported his Democratic opponent that she was transferred and began receiving poor performance evaluations. Ms. Hickman repeatedly asked Mr. Reuter to transfer her out of the traffic division, just as other employees had been transferred. He refused, however, suggested that she quit, and otherwise ignored her complaints that Ms. Cusick was mistreating her. He similarly ignored her concerns of being inadequately trained and of being fired and told her to relax. Yet at the same time, he had Ms. Cusick document negative monthly performance evaluations that served to justify her dismissal. This evidence satisfies Ms. Hickman's burden to show that her political affiliation and activities were a motivating factor in her dismissal. That there was evidence she made mistakes on the job does not compel the conclusion that she would have been fired in any event, because the outside panel of judges overruled her dismissal and reinstated her. Accordingly, the district court properly denied qualified immunity on Ms. Hickman's claim against Mr. Reuter.

IV

The district court's denial of qualified immunity is affirmed. Appellees' motion to expedite submission of the case to a panel is denied as moot. Appellees' motion to supplement the record on appeal with Missouri Court Operating Rule 7 is denied as unnecessary.

_____