**Shelva WARNER, Plaintiff,**

v.

**CITY OF TERRE HAUTE, INDIANA, Joe Newport, individually and as its Chief of Police, and James Jenkins, individually and as Mayor of the City of Terre Haute, Defendants.**

**No. TH 97–024–C M/F.**

United States District Court,
S.D. Indiana,
Terre Haute Division.

Dec. 8, 1998.

Eric A. Frey, Frey Law Firm, Terre Haute, IN, for Plaintiff.

Scott M. Kyrouac, Wilkinson Goeller Modesitt, Wilkinson & Drummy, Terre Haute, IN, for Defendants.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This matter comes before the Court on a motion filed on January 16, 1998, by defen-

dants, the City of Terre Haute, Joe Newport, individually and as Chief of Police, and James Jenkins, individually and as Mayor of the City of Terre Haute. After several extensions of time for the plaintiff, Shelva Warner, to respond, the motion became ripe for resolution on July 22, 1998. The defendants seek judgment in their favor on all claims raised by the complaint. Count I includes claims that the defendants deprived the plaintiff of civil rights protected by the Constitution and federal laws, all in violation of 42 U.S.C. §§ 1981 and 1983. Count II alleges a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, based on alleged discrimination because of plaintiff's sex and harassment that created a hostile environment.

For the reasons further explained below, the Court finds the defendants' motion for summary judgment well-taken. The plaintiff has not presented sufficient evidence to create a genuine issue of any fact that is material to her claims. Consequently, the motion for summary judgment should be, and hereby is, **GRANTED.**

## I. FACTUAL BACKGROUND

Plaintiff, Shelva Warner ("Warner"), has been employed as a police matron by the City of Terre Haute ("the City") since November 15, 1979. Warner Aff. ¶ 2, Ex. A. She continues in that position despite the alleged adverse actions taken against her by the defendants. *Id.* The City is a unit of government organized under the laws of the State of Indiana, with a population that places it in the category of a second-class city. *See* Ind.Code § 36–4–1–1. Defendant Jim Jenkins ("Jenkins") became the mayor of the City on January 1, 1996, after defeating the previous mayor in the primary election, and he continues in that position to the present. Jenkins Aff. ¶ 2. Co-defendant Joe Newport ("Newport") was sworn in as chief of police for the City in January 1996, and he continues in that position to this date. Newport Aff. ¶¶ 1,2. One of Newport's two assistant chiefs, Martin Dooley ("Dooley"), is in charge of the division in which Warner is employed. Dooley Dep. at 12.

When Warner was appointed by the Board of Public Works and Safety in 1979, it was as a member of the City's police department in the capacity of matron. As such, she was required to wear a uniform, carry a firearm and hand cuffs, obtain permission for off-duty work, and meet mandatory annual training requirements. *Id.* ¶¶ 4, 5. Warner has concluded from these indices that she is a member of the police department, despite the fact that state law specifically states that police matrons are not members of city police departments. Ind.Code § 36–8–3–19. For purposes of this motion the Court will assume that Warner is a member of the City's police department and will consider the City's actions in that light.

By 1996, Warner had worked for approximately fifteen years at the information desk at City Hall in Terre Haute. Her job required daily public contact in person and on the telephone, she answered questions, gave directions, provided information, escorted female prisoners to and from city court, and oversaw activities in city court. *Id.* ¶ 10. Ordinarily, Warner was assisted by another officer because her varied duties would sometimes take her away from the desk. *Id.*; Barnett Dep. at 12–14. In early 1996, shortly after a change in administration, Warner was transferred from her position at the information desk to a clerical position in the police department records room. Warner Dep. at 17; Dooley Dep. at 22. Next, her work schedule changed from daytime hours to evening hours, and she was temporarily deprived of a lunch or dinner break. Warner Dep. at 17–19, 22; Dooley Dep. at 23.

At about this same time the Indiana Legislature voted to allow police matrons to be included in police pension funds, rather than in the Public Employee Retirement Fund ("PERF") for civilian employees. Ind.Code § 36–8–8–1(3). Warner had requested that her pension be transferred from PERF to the police pension fund prior to the effective date of the new law. Hutton Dep., Ex. 4, Undated Letter; Warner Aff. ¶ 26. Although no formal action was taken on that request for approximately eighteen months, a letter from the City's attorney, William Drummy ("Drummy"), dated April 23, 1996, indicated the City was considering the request. Def's Ex. 13, Letter dated April 23, 1996. In the letter, Drummy requested

guidance from Thomas Parker, the Director of the 1977 Police Officers' and Firefighters' Pension and Disability Fund ("1977 Pension Fund") at PERF. Def's Ex. 13, Letter dated April 23, 1996; Ex. 12, Memo dated October 9, 1997. Specifically he asked Parker about the eligibility of, and proper enrollment procedures for, the two matrons in connection with the 1977 Pension Fund. *Id.* By December of 1997, the City Council had sufficient information to vote on including matrons in the police pension fund, and a resolution was passed that month to effect the change. Plf's Ex. G, Hutton Dep., Ex. 2, Letter dated December 30, 1997. Warner concedes that she is now a member of the 1977 Pension Fund and makes her retirement contributions to that fund. Warner Dep. at 48.

Warner attributes the defendants' treatment of her—the changes in her position and work schedule, the delay in transferring her pension—to the fact that she had opposed the current mayor's election. During the 1995 mayoral primary election Warner supported the incumbent mayor, Pete Chalos ("Chalos"), in his contest against defendant Jenkins. *Id.* ¶ 7. She also served as a precinct committee person who worked to support Chalos and defeat Jenkins. *Id.* Chalos lost the primary election to Jenkins, who subsequently ran unopposed in the November general election and was elected mayor. *Id.* ¶¶ 7–8. In late 1995, Jenkins announced that he would appoint Dale Loudermilk, the son of former police chief Gerald Loudermilk, as assistant police chief. Loudermilk Aff. ¶ 4; Warner Aff. ¶ 9. The Loudermilk family had been active supporters of Jenkins' mayoral election. Warner Aff. ¶ 8. Warner alleges she began hearing rumors shortly after Chalos' unsuccessful primary campaign that Jenkins and others planned to retaliate against her once they came to office for her support of Chalos. *Id.* ¶ 8.

When Jenkins assumed the office of mayor in January 1996, he appointed defendant Joe Newport as chief of the police department. Prior to that time Newport had been an officer with supervisory duties during the Chalos administration, and Warner had always gotten along well with him. Newport Aff. ¶ 3; Warner Dep. at 20. After hearing from several sources she considered credible that Jenkins intended to fire her, Warner arranged an appointment with the newly-elected mayor to inquire about her position. Warner Dep. at 53. She told him about the rumors she had been hearing and he said that "he was going to be way too busy being mayor to worry about matrons." Warner Dep. at 53. Jenkins told her he also had heard rumors about various people he would be firing when he came to office, and he was not going to fire anybody. *Id.* No evidence has been presented that Jenkins fired anyone.

After Jenkins and Newport took office, Newport transferred Warner to the records room, where she had never worked before, to perform clerical work. Warner Dep. at 18; Dooley Dep. at 22, 27. It is not disputed that the police department had a labor shortage at the time. Warner Dep. at 74. Nor is there any dispute that the records department was behind in its work. However, Newport did not give Warner a specific explanation for why she was being transferred. *Id.* at 19. She began working in records in January, and by March of 1996 Warner's hours were changed from days, 6:30 a.m. to 2:30 p.m., to evenings, 12:00 noon to 8:00 p.m. *Id.* at 20. Warner had worked a daytime shift since the beginning of her employment in 1979. *Id.* at 21. She was not given a reason for the 1996 change in her work schedule. *Id.* at 22. Moreover, she was told she would not get a dinner hour during the noon to 8:00 p.m. shift, because her superiors did not want the records room closed. *Id.* at 22–23. The next day after Warner was assigned the noon to 8:00 p.m. shift with no dinner break, she was changed to a 1:00 to 9:00 p.m. shift that included a dinner break. *Id.* Warner worked this shift in the records room until approximately July 2, 1996, when she was returned to the information desk and a daytime schedule, but with no extra officer to assist her. *Id.* at 25.

For some reason Warner worked without a lunch break for eighteen days, during which time she complained to "anybody that would listen," and then she contacted her attorney who sent a letter to the department about the situation. *Id.* at 26, 28; Warner Aff. ¶ 24. Although it is not clear from the record what caused the change, after her attor-

ney's letter was sent Warner got a lunch break of forty minutes. Warner Dep. at 28. The only other conversation Warner ever had with Jenkins occurred at about this time, in late July or August of 1996. *Id.* at 53. He told her she was doing a "great job" and asked her if her lunch hours had been straightened out. *Id.* at 53, 91. When she told him they had not, he said that he would talk to Chief Newport about it. *Id.* at 54. It was after this conversation that Warner and all of the dispatchers were told to take a forty-minute lunch break each day and twenty-minutes of additional breaks through the day. *Id.* Warner's break was often at 9:30 or 10:00 a.m., which was a difficult time for her to find any lunch-type food nearby. *Id.*

Warner believed the changes in her work assignments and schedule, the pension fund difficulties, and the restriction on her lunch break constituted discriminatory treatment because she had supported Chalos. According to Warner, the secretaries and police officers were not limited to just one hour of breaks each day. Warner Dep. at 54–55. She also complained that she did not really get an hour in daily breaks. *Id.* Even though Warner had been told she could take additional breaks in the morning and afternoon, she often got called back to the desk when it was busy. Warner Dep. at 92. Warner's work schedule changed again in July of 1997, when a police substation opened, and she began working an 8:00 a.m. to 4:00 p.m. shift. *Id.* at 28–29. She continued to be limited to a forty minute lunch break, but it occurred later than 9:30 or 10:00 a.m. *Id.*

During the time that Warner was working in the records room, Lieutenant David Barnett ("Barnett") received his new assignment to the position of day shift commander. Barnett Dep. at 9–10. He had previously been the night duty commander. *Id.* at 16. As day shift commander, Barnett was in charge of all the squad cars working during that shift, the 911 operators and radio dispatchers for both the police and fire department, and the information desk, but not the records room. *Id.* at 22–26. Consequently, when Warner returned to the information desk position in July 1996, Barnett became her new supervisor. *Id.* Even though Barnett had no involvement in Warner's transfer to the records room, he understood it to have

been because of a serious backlog in record-keeping, and the need for additional help to catch it up. Barnett Dep. at 15–16. It is not clear that this explanation was ever given to Warner.

As shift commander, Barnett sat at a desk in the basement of City Hall, just outside of the radio dispatch area. Barnett Dep. at 10, 23–24. The information desk is located in the main lobby on the first floor of City Hall, so that members of the public encounter it when they first arrive. Warner Aff. ¶ 10. Consequently, Barnett had no visual contact with anyone posted at the information desk. This increased the difficulty with supervising that position. When dispatchers left their stations to go to lunch or the bathroom Barnett could usually see them leave, although they also came into his office and reported their activities to him. Barnett Dep. at 23–24. Sometimes he could not let them leave for a lunch break when they wanted to, because there would be no one to relieve them; if the radio room was understaffed the dispatchers could not go to lunch. *Id.* at 24. The same was true with the information desk.

Barnett testified that he tried to allow his employees to go out every day, but sometimes it could not be done. *Id.* If it was too busy, they had to stay at their posts and work through lunch. DeHart Dep. at 24. According to Barnett, "[a]fter Matron Warner gets relief for lunch, if I have a police [officer] I bring them from the field and try to relieve that radio operator." Barnett Dep. at 24. Barnett's job was no less demanding. On occasions when he would have to leave his desk, even to go to the bathroom, he carried a portable radio with him so he could be reached. *Id.* at 26. To take a lunch break, Barnett would have to locate a field sergeant to come in and relieve him, but while he was out he was on call as a "working field sergeant." *Id.* at 27. This meant that if a call for assistance came in, Barnett would have to leave his lunch and go supervise the officers taking the call. *Id.* In contrast, after the eighteen days without a lunch break, Warner consistently was able to take a lunch break. Warner Dep. at 28–29.

Warner also claims that two other events occurred that show the discriminatory or retaliatory animus against her. First, she was denied the opportunity in September of 1996 to accompany an officer on an out-of-town trip to pick up a female prisoner, which meant the loss of some overtime hours. Warner Dep. at 82. She was told that the officer requested that she not go with him because she would smoke in the car. *Id.* at 83. Warner had accompanied this officer before for a prisoner pick-up and she did smoke in the car. *Id.* However, the officer took a civilian dispatcher with him, Barbara DeHart, who also was a smoker. *Id.;* DeHart Dep. at 28. DeHart testified that she smoked in the car on the way to pick up the prisoner, although she would have honored a request that she not smoke, but she did not smoke on the way back.[1] DeHart Dep. at 46–47. Warner asserts that she, too, would have honored a no-smoking request. Warner Dep. at 83.

The second event was that Barnett began keeping a log of Warner's activities, in which he recorded the times she was away from the information desk and the purpose for her leaving. Warner Dep. at 32–33. To facilitate this record-keeping, Warner had to call the commander whenever she left her station, even if it was to go to the bathroom. *Id.* at 30–31. She felt it was humiliating to have to call a man and ask permission to go to the bathroom. *Id.* The log was kept on a yellow pad of paper and it consisted of approximately three pages. *Id.* at 33, 35.

Keeping the log was precipitated by an incident during which Warner had gone to a captain's office to retrieve some papers and she had told Barnett where she was going. *Id.* at 38–40. Although Barnett nodded to her, he had apparently not absorbed the information. *Id.* While she was gone, a superior officer, Captain Brentlinger, who was looking for her asked Barnett where she was, and became upset when Barnett could not say. *Id.* at 39. According to Warner, Captain Brentlinger thought she should get a

suspension for being absent from her station. *Id.* at 38. Barnett did not suspend her because he had considered it his fault for not remembering where she said she was going. *Id.;* Barnett Dep. at 20. According to Barnett,

> After a month of people calling me and asking where is the information desk officer, I didn't know, I'd forgot.... I had problems keeping track of where Mrs. Warner was at after she had called me a minute before. Captain Brentlinger, my immediate supervisor would be asking me, and he was telling me this was a problem why I didn't know where Mrs. Warner was at .... so I took the initiative—and also I think initially I wanted a log kept so I knew exactly where she was at. If someone called I knew where she was .... so I wouldn't feel like I was on the spot and I couldn't tell.

Barnett Dep. at 18–19. When Barnett informed Warner that he had to keep track of her whereabouts and about keeping the log, she became upset and cried.[2] Warner Dep. at 39; Barnett Dep. at 43–45.

Once he decided to keep the log for this reason, Barnett discovered it was also useful in determining ways to improve the coverage on the information desk by examining the types of tasks that took Warner away from the desk. Barnett Dep. at 19–20. He learned that one of those tasks was when she had to do a title check for someone, which entailed her going outside to see the vehicle. Barnett Dep. at 19. Barnett took that job away from her. *Id.* "That kept her in the office," Barnett testified. "Then the phones would be answered, and the people coming in would be met by an officer, a matron, Mrs. Warner, and that improved my job situation a lot." *Id.* at 20. Barnett got the idea for creating "Warner's Log" from the procedures used with squad officers who must call in whenever they leave their cars so the information could be entered in a computer log of the officer's activities. Barnett Dep. at

---

1. According to DeHart she did not smoke with the prisoner in the car because she did not want to have to handle a request from the prisoner for a cigarette. DeHart Dep. at 46.

2. DeHart described Barnett as "one of these kind of people that kind of does things to death, and in order for him to be able to tell Captain Brentlinger at any given second where anybody was, I could see him keeping notes on it." DeHart Dep. at 16.

20–21. According to Barnett, "[e]very sergeant [or] officer that goes out on a call, when they . . . get out of that car they call in, and we put it in the computer . . . that they're taking a break." *Id.* at 21. Before he started supervising Warner during the day shift on the information desk, Barnett had no idea of how busy it was. *Id.* Keeping the log helped him identify ways to improve the job. *Id.* Nevertheless, Barnett only kept it for a period of about two weeks, from September 11 to September 19, 1996. Barnett Dep. at 38–39, 46; Def's Ex. 11, Warner's Log.

He stopped keeping the log because, after a couple of weeks, he had a better understanding of the information desk job during the day shift. Barnett Dep. at 46. Barnett was satisfied that he had some idea of the reasons why Warner would have to leave the desk and approximately how long it would take for her to return. *Id.* This understanding assisted him when handling calls from his superiors asking him were Warner was, and it allowed him to make some adjustments in her job duties that he felt were improvements. *Id.* at 46–47. However, Warner did not perceive these events as improvements, for she felt she was no longer free to walk away from her desk whenever she needed to as she had in the past. *Id.* at 41.

In sum, Warner claims that her transfer to the records room, the change to a night shift, losing her lunch breaks, her pension difficulties, the loss of overtime pay for traveling to get prisoners, and the log that was kept of her activities were all events that altered her working conditions. These alterations occurred after she had engaged in protected political activity, and she argues that the alterations were in retaliation for that protected activity. The defendants have offered a non-discriminatory reason to explain each event that occurred, but they also claim that there can be no municipal liability and that the individual actors are qualifiedly immune from liability. After briefly setting forth the standards to follow, the Court will address these issues.

## II. STANDARDS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth,* 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n,* 874 F.2d 419, 428 (7th Cir.1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries,* 121 F.3d 281, 286 (7th Cir.1997); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992).

If a reasonable factfinder could find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters.*, 975 F.2d at 1294.

### III. DISCUSSION

Warner has brought this action against the City of Terre Haute, its mayor and police chief under three different federal statutes. First, she invokes 42 U.S.C. § 1983, which provides a remedy for violations of the civil rights that are protected by the United States Constitution or other federal laws. Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

Under this law, Warner seeks to enforce her rights of expression and of association under the First Amendment of the Constitution. Sub-part A of this section will address these issues.

█ Next, Warner claims that the defendants' conduct violated the "Civil Rights Act of 1991," 42 U.S.C. § 1981, which guarantees all persons "the same right ... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings ... as is enjoyed by white citizens ...." 42 U.S.C. § 1981(a). The 1991 amendments to this act clarifies that the right to "make and enforce contracts" includes the performance of contracts, and the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Courts have construed this provision to apply to contractual employment relationships. *See Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1034 (7th Cir. 1998). To properly invoke this statute, how-

ever, the complaining party must demonstrate membership in the protected class of ethnic minority citizens, as well as existence of a contractual relationship. *Id.; Rush v. McDonald's Corp.*, 966 F.2d 1104, 1119 (7th Cir.1992).

█ As the defendants have correctly pointed out, Warner has not alleged or presented any evidence that she was denied any employment benefit, opportunity, or privilege because of her status as a member of an ethnic minority. In fact, the evidence is that she is a white female, Jenkins Aff. ¶ 4, with no particular ethnic characteristic or ancestry that would make a claim by her actionable under § 1981. *See St. Francis College v. Al–Khazraji*, 481 U.S. 604, 612, 107 S.Ct. 2022, 95 L.Ed.2d 582, *reh. denied*, 483 U.S. 1011, 107 S.Ct. 3244, 97 L.Ed.2d 749 (1987); *Bisciglia v. Kenosha Unif. Sch. Dist.*, 45 F.3d 223, 229 (7th Cir.1995). Consequently, her claim in Count I charging a violation of § 1981 should be dismissed, and summary judgment in favor of the defendants should be, and hereby is, **GRANTED.**[3]

Finally, Warner has asserted a claim under Title VII for alleged employment discrimination because of her sex. Under that statute,

> [i]t is an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ... or (2) to limit, segregate, or classify ... employees ... in any way which would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex....

42 U.S.C. § 2000e–2(a). For her claim of sex discrimination, Warner states that the defendants "rendered her workplace a hostile environment as that term has been defined by law." Compl. ¶ 20. It appears she is asserting the sexual-harassment type of sex discrimination claim, which will be considered in

---

**3.** In addition, a party with a claim for damages against a state governmental unit has an "exclusive federal remedy for violation of the rights

guaranteed in § 1981" under § 1983. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

Sub-part B of this section in accordance with the analytical framework established for hostile environment sexual harassment claims.

■ Warner also claims that the City denied her certain pension benefits to which she was entitled as of July 1996, and that she was forced to file this suit in order to obtain those benefits. She does not specify the statutory basis for this claim, other than in her discussions about alleged § 1983 violations.[4] However, in December of 1997 the City passed a resolution to include Warner and the other police matron in the 1977 Pension Fund. The defendants argue that this action renders Warner's claim with respect to her pension moot. According to Warner, however, the City's eventual compliance with her request to be included in the 1977 Pension Fund occurred only because she filed suit, which makes her a prevailing party under §§ 1983 and 1988. The Court will address this issue separately in Sub-part C.

## A. § 1983 FIRST AMENDMENT CLAIM

■ In order to succeed on a claim under § 1983 a plaintiff must prove two distinct elements: (1) conduct by a person acting under color of state law; (2) which deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States, proximately causing injury. *Brown v. City of Lake Geneva,* 919 F.2d 1299, 1301 (7th Cir.1990); *Bayview–Lofberg's, Inc. v. City of Milwaukee,* 905 F.2d 142, 144 (7th Cir.1990). Warner's theory on the first element is that her re-assignment, surveillance, and other alleged instances of disparate treatment, occurred at the hands of employees of the Terre Haute Police Department during performance of their duties. *See Gibson v. City of Chicago,* 910 F.2d 1510, 1516 (7th Cir.1990). There is no dispute about this element.

■ With regard to the second element, the defendants claim that Warner did not allege conduct that would be protected under the First Amendment, arguing that her polit-

ical activity constituted speech on a matter of private concern. The Court does not agree. Warner has alleged a colorable claim, because the freedom to associate with others for the advancement of common political beliefs and ideas is a form of orderly group activity protected by the Constitution. *See Elrod v. Burns,* 427 U.S. 347, 357, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Rutan v. Republican Party of Ill.,* 497 U.S. 62, 70, 110 S.Ct. 2729, 111 L.Ed.2d 52, *reh. denied,* 497 U.S. 1050, 111 S.Ct. 13, 111 L.Ed.2d 828 (1990). Likewise, the expression of those political beliefs and ideas is not a matter of private concern, but is constitutionally protected.

■ In her complaint, Warner alleges that Gerald Loudermilk was a confidante of Jenkins, that he was the former police chief under Chalos, but was demoted by Chalos, and that he asked Jenkins to make her working conditions unbearable so she would resign. Compl. ¶ 6. She also alleges that the defendants' conduct toward her constitutes retaliation against her because she testified in litigation against the City. That action was *Hiatt, et al. v. Chalos and Watts,* and it was brought by several police officers against then mayor Chalos and chief of police Watts. Compl. ¶ 15. Neither party has attempted to characterize Warner's claim of retaliation for having testified against the City, but the Court finds that such conduct could be actionable under § 1983 as a possible violation of Warner's free speech rights. The defendants merely deny that it happened, and Warner has developed no facts and offered no argument in support of any claims about retaliation for giving testimony. Consequently, the Court finds that this claim has been waived.

Nevertheless, if Warner can produce sufficient evidence to allow a reasonable factfinder to agree with her theory of liability regarding political retaliation, she will succeed in opposing summary judgment on the § 1983 claim.

4. Because she is a public employee and her pension plan is a governmental plan as defined in the Employee Retirement Income Security Act, Warner's pension benefits claim is excluded from protection under that federal law. *See* 29 U.S.C. § 1003(b) (stating that ERISA shall not apply to any employee benefit plan if it is a governmental plan); 29 U.S.C. § 1002(32). Consequently, she is unable to avail herself of the attorney fee provisions in ERISA. *See* 29 U.S.C. § 1132(g)(1).

Complicating her task is the fact that holding municipalities and municipal officers liable for constitutional violations requires certain specific types of evidence, without which no liability will attach. This is because the "person" whose conduct supposedly incurred liability is the municipality itself, and it cannot be held liable on a *respondeat superior* basis. Warner has sued the City of Terre Haute, and Jenkins and Newton in both their individual and official capacities. Her claim is therefore vulnerable to the defense that no municipal liability may attach, as well as to a qualified immunity defense. Both of these issues must be addressed before considering whether sufficient evidence was offered to show that any alleged conduct by the defendants caused a constitutional deprivation.

### 1. MUNICIPAL LIABILITY

 When a plaintiff sues a municipality under § 1983 for acts of its employees, she must demonstrate how the municipality may be held liable.[5] To succeed on her claim, the plaintiff must show that enforcement of a municipal policy, or some other deliberate municipal action, caused the alleged constitutional deprivation and its consequential damages. *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 122–23, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *City of Canton v. Harris,* 489 U.S. 378, 385–86, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Municipalities are answerable only for their own decisions and are not vicariously liable for the constitutional torts of their agents. *See Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Auriemma v. Rice,* 957 F.2d 397, 399 (7th Cir.1992). Instead, it is only when the execution of a government's policy or custom inflicts the injury that the government as an entity may be held responsible under § 1983. *Id.* at 694, 98 S.Ct. 2018; *see also Hirsch v. Burke,* 40 F.3d 900, 904 (7th Cir.1994).

 A plaintiff has three alternative means of showing municipal liability for a deprivation of her rights. First, the plaintiff may prove the existence of an express municipal policy the enforcement of which is inherently unconstitutional, or as a plurality of the Supreme Court has stated, would be invalid "by its terms." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822, 105 S.Ct. 2427, 85 L.Ed.2d 791, *reh. denied,* 473 U.S. 925, 106 S.Ct. 16, 87 L.Ed.2d 695 (1985) (citing as an example the policy in *Monell,* 436 U.S. at 658, 98 S.Ct. 2018, which compelled pregnant employees to take mandatory leaves of absence before such leaves were medically necessary). If the policy is inherently unconstitutional, the plaintiff need only show that it was enforced or applied one time—*i.e.,* in the plaintiff's own case—for the municipality to become liable. *Id.*

Second, the plaintiff may show that an injury resulted from enforcement of an unexpressed municipal policy—such as inadequate implementation, supervision, or training—which exists due to the "deliberate indifference" of municipal officials. *See Harris,* 489 U.S. at 385–86, 109 S.Ct. 1197; *Graham v. Sauk Prairie Police Comm'n,* 915 F.2d 1085, 1100 (7th Cir.1990). Deliberate indifference is present when an inadequacy "is so obvious, and ... so likely to result in the violation of constitutional rights, that the policymakers for the [municipality] can reasonably be said to have been deliberately indifferent ...." *Graham,* 915 F.2d at 1101 (quoting *Harris,* 109 S.Ct. at 1205); *Hirsch,* 40 F.3d at 905 (simple negligence will not suffice to attach § 1983 liability).

The plaintiff cannot demonstrate existence of an unexpressed municipal policy, however, by relying on one isolated instance in which constitutional rights were violated. Instead, the plaintiff must show "multiple incidents of unconstitutional conduct," *Gibson v. Chicago,* 910 F.2d 1510, 1522–23 n. 20 (7th Cir.1990), or a "widespread practice that... is so per-

---

5. Warner has merely alleged that the political retribution she suffered "came from the highest sources in the City and the Police Department." Plf's Brf. at 6. She made no effort in her brief to prove the existence of a custom or policy of retaliating against employees for political activity, but apparently assumed that because she was accusing the chief of police and the mayor, her claims were against the City. She also sued Jenkins and Newport in their individual capacities, in case her municipal liability strategy failed. In the future, counsel would be advised to state more clearly the basis for imposing municipal liability, and to attempt to prove that liability when defending a summary judgment motion. *See Venters v. City of Delphi,* 123 F.3d 956, 966 (7th Cir.1997).

manent and well-settled as to constitute a custom or usage with the force of law." *Baxter by Baxter v. Vigo Cty. Sch. Corp.*, 26 F.3d 728, 735 (7th Cir.1994) (quotations omitted). Mere boilerplate claims that a policy exists will not be sufficient, *Baxter*, 26 F.3d at 736; instead, the plaintiff must demonstrate a pattern of unconstitutional conduct resulting from the unexpressed policy. *Id.; Graham*, 915 F.2d at 1100; *Gibson*, 910 F.2d at 1522, n. 20.

Third, when the actions alleged to have violated a plaintiff's constitutional rights are taken directly by a person with final policy-making authority, or by the municipality itself, then the plaintiff need not establish the existence of a separate municipal policy or custom. *See Glatt v. Chicago Park Dist.*, 87 F.3d 190, 193–94 (7th Cir.1996) (noting that an allegation of a municipal policy or custom is not necessary when the defendant committed the unlawful act directly, rather than through employees below the policymaking level). For example, if a mayor has final policy-making authority and directed that an employee be treated in a way that violates his or her constitutional rights, the municipality's liability would be direct. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (an unconstitutional governmental policy could be inferred from a single decision taken by highest official responsible for setting policy in that area of government's business); *De-Guiseppe v. Village of Bellwood*, 68 F.3d 187, 190 (7th Cir.1995) (municipal liability will not result from official's conduct unless official is a final decision-maker). Plaintiffs may not, however, simply assume that a given official can set policy for the municipality, without demonstrating the legal basis for such authority.

 Here, Warner has sued the City of Terre Haute, its mayor and its chief of police in both their official and individual capacities. She claims that she was harassed by superior officers in the Terre Haute Police Department as part of a campaign to retaliate against her for supporting the incumbent mayor during his primary election contest with Jenkins, who became the new mayor. However, a suit against a municipal officer in his or her official capacity is construed as a suit against the municipal entity. *DeGuiseppe*, 68 F.3d at 189–90; *Yeksigian v. Nappi*, 900 F.2d 101, 103 (7th Cir.1990) (citing *Kentucky v. Graham*, 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Because Warner has already sued the City, her suit against its mayor and police chief in their official capacities is redundant. For this reason, the Court will analyze the City's liability using municipal liability principles, and that of the two men using individual liability principles.

 With respect to the former, Warner has not alleged, or provided evidence about, any express municipal policy that deprived her of her constitutional rights. In fact, she has made allegations that specifically contradict any finding of an express municipal policy behind the conduct about which she complains. Here, as in *Auriemma*, an express policy prohibited the acts of which the mayor and police chief are accused.[6] "Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy." *Auriemma*, 957 F.2d at 400. This means that the only way to impose liability on the City for the mayor's or police chief's actions would be to find a custom or practice of acquiescence by the municipal policy-maker in such rule-breaking, or to find that one or both of these men were policy-makers for purposes of the events in question. *See Jett*, 491 U.S. at 737, 109 S.Ct. 2702 (court must identify official who speaks with final policy-making authority concerning the action alleged to have caused the particular constitutional deprivation). Thus, for Warner to survive sum-

---

**6.** Warner's complaint alleges that the City of Terre Haute has a police department Merit Commission, which has established a Manual of Rules to govern the conduct of members of the police force. Comp. ¶ 14. According to Warner, the Manual prohibits any form of retaliation or reprisals toward police officers who engage in any political activity. *Id.* Defendants Newton and Jenkins are alleged to have ordered retalia-tion or reprisals against her for her political activity, which Warner claims contravenes the police department's written policy. *Id.* By this admission, therefore, Warner bars a subsequent claim that the conduct at issue in this action resulted from or furthered the express official policy of the City. *See Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir.1992).

mary judgment on the issue of municipal liability, she must proffer sufficient evidence from which a reasonable fact-finder could discern either an unexpressed municipal policy, practice, or custom of acquiescence, or conduct by a person who has final policymaking authority with respect to actions taken against her.

The Court finds no evidence that would support Warner's allegations of an unexpressed policy. She has made only conclusory references to an unexpressed policy of retaliatory harassment for political activity. No proof has been offered that any retaliatory or harassing conduct was directed at any other city employee, which makes Warner's situation an isolated one. Municipal liability cannot attach for an unexpressed policy, or widespread practice, of acquiescence in unauthorized acts based on only one isolated instance of such conduct. *See Baxter,* 26 F.3d at 735. Warner's evidence falls far short of raising a factual issue regarding whether there was a wide-spread pattern or practice of allowing the mayor and police chief to harass employees for their political beliefs or activities. Thus, Warner cannot use this method of imposing liability on the City.

 The only remaining method for imposing liability on the City under § 1983 is if Warner can show that the alleged harassing conduct was directed by a person with final policy-making authority with respect to the conduct in question. The locus of a municipality's policy-making authority is determined with reference to state and local law. *Eversole v. Steele,* 59 F.3d 710, 715 (7th Cir.1995); *Auriemma,* 957 F.2d at 400. However, the determination must be made with respect to the type of policy at issue. *Id.* For example, if the alleged policy is to retaliate against employees who are political opponents of the mayor's by harassing them on the job, then the relevant policymaker would be the person who sets workplace rules. *See Eversole,* 59 F.3d at 716; *Auriemma,* 957 F.2d at 400.

 Terre Haute is a second-class city under the laws of the State of Indiana, and as such it has both a legislative body, the city council, and an executive, the mayor. *See* Ind.Code § 36-4-4-1 to 36-4-4-4, § 36-4-5-1 to 5-4. In general, municipal policy for a city of this type is set by the legislative body. *See Auriemma,* 957 F.2d at 400; Ind.Code §§ 36-1-3-6, 36-1-3.5-1, 36-1-4-1 *et seq.,* 36-1-5-3. That authority may be delegated by the legislative body to a member or agency of the executive branch. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Ordinarily, a city's board of public safety, which is established by the legislature, "shall administer the police and fire departments of the city" and have "exclusive control over all matters and property relating to the [those departments]." Ind.Code § 36-8-3-2(a), (b); *see also* Ind.Code § 36-4-9-4. The safety board is empowered by state law to "adopt rules for the government and discipline of the police and fire departments; and adopt general and special orders to the police and fire departments through the chiefs of the departments." Ind.Code § 36-8-3-2(c). The only exception to the safety board's authority to administer the police department occurs when there is a merit system established by statute or ordinance. Ind.Code §§ 36-8-3-2(a), 36-8-3-5. In that instance, the merit board or commission has exclusive authority over the appointment, discipline, demotion, promotion, and suspension of police officers, unless its establishing law specifically incorporates the Indiana Code sections providing such authority to the safety board. Ind.Code § 36-8-3-5.

Here, the City's legislative body, with approval of a majority of the members of the police department, has adopted a merit system for the City's police department. Dooley Dep. at 9, 21. Such a system requires the establishment of a merit commission that creates rules for, administers and governs the police department. Ind.Code §§ 36-8-3.5-3, 3.5-6, 3.5-10, 3.5-11, 3.5-17. The merit commission may appoint and remove members of the department except for members in "upper level policymaking positions," which includes the chief and members in the next three ranks and pay grades immediately below the chief.[7] Ind.Code §§ 36-8-3.5-11,

---

**7.** The City has a full-time paid police department consisting of the Detective Division, which performs criminal investigations, and the Uniform

Division, which includes matrons, civilians, and uniformed patrol officers. Dooley Dep. at 11-12.

36–8–1–12. The upper level policymaking positions are appointed by the executive for the city, which in this case is the mayor, Jenkins. *Id.* Likewise, the mayor appoints two members to the five-member merit commission, while the legislative body appoints one member and the police department elects two members. Ind.Code § 36–8–3.5–6.

The merit commission is authorized to take certain disciplinary actions against regular members of the department, after holding ·a hearing if requested by the member. Ind. Code § 36–8–3.5–17. If a member is suspended for more than ten days, the member may appeal the commission's decision to the circuit or superior court of the county. Ind. Code § 36–8–3.5–18. The chief of police ·may take certain summary disciplinary actions on his own, including a written reprimand and up to a five-day suspension, without a hearing, if he notifies the commission in writing within forty-eight hours of such action and the reason for it. Ind.Code § 36–8–3.5–19. The member being disciplined may ask the commission to review the action and either uphold or reverse the chief's decision. *Id.*

With this structure for governing the police department, it appears that the City has vested its chief of police, in this case Newport, with exclusive control of the police department, subject to review by the merit commission. Ind.Code § 36–8–3.5–11, 3.5–18. The Seventh Circuit has held that a police chief in Indiana is the final policymaker for the municipal police department. *See Eversole,* 59 F.3d at 716. However, the policymaker determination in *Eversole* was made with respect to the rules and regulations governing arrests. *Id.* at 714. Here, the question is who had final policymaking authority with respect to workplace rules and duty assignments for members of the police force.

That inquiry requires examination of the relationship between the merit commission and the police department concerning personnel management. It is not answered in the statutes. Instead, the Court must turn to other documentation of that relationship.

According to the Manual of Rules of the Terre Haute Police Department (the "Manual"), the policies, procedures and rules it contains are established by the chief of police and the merit commission. Dooley Dep., Ex. 6, Manual of Rules at 16. The Manual sets out the general responsibilities of all police personnel, which includes obeying and carrying out "all lawful policies, orders and procedures issued by the Chief of Police and superior officers, whether the orders are written or oral." *Id.* at 19. Further, it states that the "Chief of Police is responsible for the day to day functions of the Department and the assignment of members to duties within the Department." *Id.* at 27. If a member of the department believes an order to be unjust or unreasonable, he or she must "immediately advise the superior officer issuing the order of [his or her] objection to it." *Id.* at 58. However, if given the order a second time, the member is to follow the order and then appeal it through the chain of command up to the chief. *Id.* There is no provision for an employee to appeal the chief's ruling on the order, unless the employee refuses to follow it and is disciplined as a result.

In that case, the merit commission may institute disciplinary action, or it may review and revise any such action taken by the chief or other superior officer. *Id.* at 50–51. The chief also has the authority to take whatever disciplinary action is necessary to insure the proper functioning of the department. *Id.* at 51. The Manual demonstrates that authority for setting rules, procedures and policies is shared by the merit commission and chief, but authority for day to day operations and assigning members to duties and shifts resides in the chief of police alone. In addition, the authority for administering discipline is shared between the police chief and the merit commission, because the chief's decisions are subject to review and modification by the merit commission. Thus, Newport's acts of re-assigning Warner to the records room, changing her shift schedule to nights, and requiring her to remain at her post at the information desk, were all taken

Assistant Chief of Police, Martin Dooley ("Dooley"), is in charge of the Uniformed Division of the police department. Dooley Dep. at 12. There are more than 100 members of the City's police department. Warner Dep. at 74. Conse-

quently, upper level policymakers would include the chief, Dooley and the two ranks immediately below Assistant Chief Dooley. Ind.Code § 36–8–1–12.

by a final policymaker with respect to decisions of that sort. No disciplinary measures were taken that would open the chief's decisions to scrutiny by the merit commission. Consequently, if Newport's conduct resulted in a deprivation of Warner's constitutional or other civil rights, the City would be liable for any harm caused her.

■ According to Warner, once Jenkins assumed office and appointed his own police chief, the two conspired to make her working conditions intolerable, hoping she would quit. Given that the mayor appoints the police chief, who is the final policymaker for duty and shift assignments, Warner has assumed that the mayor is a policymaker as well. Yet, the legislative control over the police department was delegated to the merit commission, not the mayor. To hold the City liable for the mayor's alleged retaliatory acts against Warner, she must "forge a link" between the action and the policy of the merit commission. *See Auriemma,* 957 F.2d at 400. There is no evidence to support such a link. Although the mayor has the power to appoint the chief and two members of the commission, he does not sit on or control the commission. Instead, there are three other members of the commission who are not appointed by the mayor and it is the commission that creates policy for the police department.

Warner seeks to link the actions taken against her to the City by means of an alleged conspiracy between Jenkins and Newport. Assuming for the moment that such a conspiracy could impose municipal liability on the City, the Court finds no admissible evidence supporting the existence of any conspiracy.[8] Consequently, the City cannot be held liable for the acts in question through any conduct by the mayor. It may, however, be liable for Newport's acts if they are proven to have caused a constitutional deprivation. Before reaching that issue, the Court now turns to an examination of whether individual liability could be imposed on Newport or Jenkins.

### 2. INDIVIDUAL LIABILITY

■ When a governmental agent engages in conduct that deprives a person of his or her constitutional or other federally-protected rights, the agent may be subject to individual liability for that conduct. *See Venters v. City of Delphi,* 123 F.3d 956, 966 (7th Cir.1997). The only additional showing needed is that the agent was acting under color of state law. *Id.* n. 2 (citing *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). When the agent is also the final policymaker and his acts directly caused the alleged constitutional harm, it follows that both the municipality and the individual actor could be held liable. *See Springdale Educ. Assoc. v. Springdale Sch. Dist.,* 133 F.3d 649, 653 (8th Cir.1998) (a supervisor may be subject to individual liability if he directly participates in constitutional violation, regardless of whether supervisor is an authorized policymaker for purposes of municipal liability). Thus, Newport could be held individually responsible for Warner's § 1983 claim, if she succeeds in proving it.

■ Having determined that Newport may be subject to individual liability even if his act as a policymaker also subjects the city to municipal liability, and assuming, without finding, that Jenkins could be subject to individual liability,[9] the Court now turns to the

---

8. Warner has offered multiple examples of hearsay evidence regarding alleged statements made by and threats attributed to Jenkins or Newport. On July 22, 1998, defendants moved to strike portions of Warner's affidavit containing such hearsay evidence. The Court has not considered the inadmissible evidence supplied by Warner, and here notes that it is only that type of evidence that is offered in support of any alleged conspiracy to take action against her. Moreover, Warner's own testimony is that Newport did not mistreat her and that Jenkins was complimentary and solicitous of whether her lunch break problems were resolved.

9. Jenkins' potential individual liability is problematic because an actor must have personally engaged in some activity that would incur fault. "Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official. A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). In short, "[i]ndividual liability for damages under § 1983 is predicated upon personal responsibility." *Schultz v. Baumgart,* 738 F.2d 231, 238 (7th Cir.1984). Because Warner has presented only inadmissible hearsay to link Jenkins to any action taken against her, his individual liability is doubtful.

qualified immunity issue. Courts created the rule of qualified immunity to ensure that public officials would not be unduly pinioned in the performance of their duties by the fear of personal liability. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). It allows officials to be shielded from liability under 42 U.S.C. § 1983 if the right they are alleged to have violated was not clearly established at the time of the incident. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. The contours of the asserted right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. While it is the defendant's responsibility to show that their conduct was not violative of any of the plaintiff's clearly established rights, *Pennington v. Hobson,* 719 F.Supp. 760, 765 (S.D.Ind.1989), the plaintiff bears the burden of demonstrating the existence and violation of a clearly established right. *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Forman v. Richmond Police Dept.,* 104 F.3d 950, 957–58 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 403 (1997); *Hannon v. Turnage,* 892 F.2d 653 (7th Cir.), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990).

The parties dispute whether the specific actions Warner alleges were taken against her could be considered unconstitutional. In support of their argument that no unconstitutional acts were taken, the defendants rely on several cases in which an employee's First Amendment right to free speech was at issue, and the courts, focusing on whether the speech was on a matter of private concern, ruled against the plaintiffs. These cases do not apply because Warner engaged in political speech and activity, neither of which are matters of private concern. The defendants have also cited cases in which the discharge of an employee based on his or her political alignment was found to be constitutional because of the employee's position of confidence or as a policy-maker—the "anti-patronage" cases.[10]

Neither of these types of cases apply here.[11] Instead, the proper standards governing Warner's theory are found in a line of cases beginning with *Bart v. Telford,* 677 F.2d 622 (7th Cir.1982), which holds that a campaign of petty harassment in response to an' employee's expression of his political views is actionable under § 1983 as a violation of the employee's First Amendment rights. One of the cases, *Pieczynski v. Duffy,* 875 F.2d 1331 (7th Cir.1989), holds that harassing a public employee for his or her political beliefs violates the First Amendment unless the harassment was so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs. *Id.* at 1333. The most recent ruling on the subject, *Wallace v. Benware,* 67 F.3d 655 (7th Cir.1995), considered whether the anti-retaliation rulings in *Bart* and *Pieczynski* applied to an employee who could be constitutionally discharged under the policy-making exception to the anti-patronage line of cases.

The court in *Wallace* notes that the purpose of the policy-making exception to the Constitution's ban on patronage dismissals is to enhance the effectiveness and efficiency of a unit of government. *Wallace,* 67 F.3d at 661. When the employee's position requires political loyalty courts allow a discharge in response to expressed political beliefs or associations that may pose "a threat to the efficient conduct of public office." *Id.* at 662. The rationale for allowing this type of retaliation is that it is presumed that the public office-holder's "action is directed toward the efficient and effective operation of his public

---

**10.** Those cases include, *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Upton v. Thompson,* 930 F.2d 1209 (7th Cir.1991), *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992).

**11.** Another argument put forth by defendants is that Warner is only protected from harassment because of sex or race under § 1983, and she has offered no evidence of any incidents of a sexual

nature. Instead, defendants note, Warner claims harassment motivated by retaliation for "political patronage." From this, defendants conclude that § 1983 provides no remedy. Another argument regarding whether Warner has a claim under § 1983 for alleged deprivation of her due process rights equally misses the point. Based on the Court's own research, these arguments do not reflect accurate statements of the law under § 1983, and misperceive the nature of the alleged wrongful acts.

office." *Id.* That rationale, the court wrote, cannot be extended to a campaign of retaliatory harassment, as opposed to discharge, of such an employee for his or her political activity. *Id.* Despite its finding that retaliatory harassment should not be allowed, however, the court in *Wallace* reversed the jury's verdict in favor of the plaintiff on grounds of qualified immunity. *Wallace,* 67 F.3d at 663.

■ In that ruling, the Seventh Circuit answered the question of whether the alleged conduct in this action sets out a clearly established constitutional violation. It does. In *Wallace,* the sheriff had waged a campaign of petty harassment against a deputy who had opposed him in the election. The court faced the issue of whether it was clearly established in 1992 that harassing a policymaking employee of the sheriff's department for his political activity during a prior election was unconstitutional. *Wallace,* 67 F.3d at 663. In a divided opinion, the Seventh Circuit held that it was not. *Id.* The distinction between dismissing and harassing a policymaking employee "is a subtle one," the court wrote, and it was not "sufficiently established in June 1992 so as to deprive [Sheriff] Benware of qualified immunity." *Id.* Despite this ruling, the court acknowledged that for future cases the principle should be considered established. *Id.* Specifically, the court held that although a sheriff may discharge such a policymaking employee, he may not harass him, making any harassment of a public employee for political speech or activity a violation of that employee's First Amendment rights. *Id.*

Relying on this law, the Court finds that the individual defendants do not enjoy qualified immunity for any acts of harassment in retaliation for Warner's political activity. What remains is a determination of issues common to both the municipal liability claim and the individual liability claims. For Warner to survive summary judgment on these claims, she must have sufficient admissible evidence to create a factual issue about whether any acts were taken against her because of her political activity. If so, she must then offer sufficient admissible evidence to support a jury finding that the actions taken were not so trivial "that a person of ordinary firmness would not be deterred from holding or expressing" those

political beliefs. *Pieczynski,* 875 F.2d at 1333.

### 3. WARNER'S CLAIMS

The alleged harassment directed at Warner included: reassigning her from the information desk, where she had worked for most of her years of service, to the records room, where she had not worked before, to perform mundane clerical tasks; changing her from a daytime shift, which she had always worked, to a night shift; not allowing her to leave the building for a dinner break during the night shift; subjecting her to constant surveillance by Barnett after she returned to the information desk in July 1996; changing her lunch break time again and reducing it from one hour to forty minutes; denying her the opportunity to perform an out-of-town transport of a prisoner, which would have paid overtime; requiring her to ask a man for permission to go to the bathroom, and, finally, delaying a response to her request to transfer her PERF pension to the police pension fund. As of January 1998, however, both Terre Haute matrons were moved into the 1977 Police Pension Fund, and the City began paying contributions to make the transfer retroactive to July of 1996.

Each of these actions, with the exception of the handling of the pension request, was taken by a member of the police department. Authority for assigning Warner to a particular shift or duty was vested in the chief and any superior officer to whom he delegated such authority. It is undisputed that Newport himself made the decision to transfer Warner from the information desk to the records room, and the subsequent decision to put her on a night shift. Dooley Dep. at 22, 27. It is further undisputed that she was not allowed to leave the building for a dinner break when she was on the night shift in the records room. Dooley Dep. at 34–35. Dooley explained why Warner was moved to the records room, why the night shift was added, and why she was not allowed to leave for a lunch break. Lieutenant Presnell, who was in charge of the records room, told Newport when he became chief that the records room was approximately thirteen to fourteen

months behind in entering reports into a computer. Dooley Dep. at 22–23.

At the same time, the department had just hired ten new police officers in November of 1995, who did not attend the police academy until June of 1996. Those officers were assigned to cover the information desk while Warner was transferred to assist with data entry in the records room. *Id.* at 23, 35. Because she routinely prepared the reports on computer that needed to be entered, it was assumed that Warner was capable of doing the work in records. *Id.* Warner did not object to, or complain about, this reassignment at the time it occurred, as she was entitled to do under the Manual of Rules. Instead, she followed the orders given her. When the ten officers went to the police academy, and after Newport discovered he could hire temporary clerical workers to help in the records room, she was transferred back. All of this is consistent with the business necessity explanation given for Warner's transfer.

Warner has offered very little evidence to disprove the defendants' explanation for the actions taken with respect to her work assignments and schedule. In fact, she has admitted there was a labor shortage at the time. Warner Dep. at 74. The only evidence offered to connect Warner's transfer to her political activity eight months earlier is the temporal relationship between that activity and when Jenkins and Newport assumed power after the election, plus a handful of hearsay comments about Jenkins wanting revenge. As noted previously, the comments she cites are inadmissible hearsay, and Warner's testimony about them is not only vague, but it does not contain sufficient facts from which to assess the reliability of the statements. For example, she does not say whether the third person from whom she learned that Jenkins wanted to make her life miserable had been told this by Jenkins. There is no way to tell the number of layers of hearsay through which the comments had passed before they were reported in Warner's deposition and affidavit. Had she included affidavits from any of the third parties who allegedly reported to her about Jenkins' intentions, her case might be stronger. But she did not. Warner's testimony about alleged statements she heard that Jenkins

made to others cannot serve to prove that those statements were made, or the truth of what was said. That is, by her testimony alone she cannot prove that Jenkins in fact harbored any retaliatory animus against her or any intentions of harassing or directing the harassment of her.

Warner has even less evidence that Newport harbored any retaliatory animus. Although he apparently supported Jenkins in the election, he was not a visibly active supporter. Warner Dep. at 51. He was described by a subordinate as one of the least political people he knows, and by Warner as having not been political until recently, when she was deposed in March of 1998. Dooley Dep. at 33; Warner Dep. at 51. In addition, Warner testified that Newport never said anything bad to her. Warner Dep. at 52. Instead, she said she heard rumors that he had said something bad about her, but she could not recall who told her that, what was said, or when it was said. *Id.*

The only acts Warner can prove were taken by Newport are her assignment to records and her shift changes. The treatment she received from Barnett once she returned to the information desk in July of 1996 was the result of his decisions about how best to supervise that position. His previous experience had been as a night shift commander, and he admitted to being unaware of how busy the information desk was during the day. Barnett was new to the job of day shift commander and, prior to Warner's return to the information desk, he had ten rookie officers covering that position. Once they left, he had only Warner. When he implemented Warner's log, he was reacting to the changes caused by having fewer workers to do the same amount of work. Warner's and De-Hart's speculation about the reasons Barnett felt pressured to keep closer track of the information desk officer cannot raise a genuine issue of material fact concerning whether her treatment was because of a directive from Newport or Jenkins.

Although Warner has argued that she was singled by Barnett, presumably at Newport's direction, to harass her by imposing limitations on her ability to leave her post, the evidence is otherwise. Dooley testified that

Warner is the only person covering the information desk who was regularly allowed to take a lunch break away from the desk. Dooley Dep. at 39–40. Warner offers no evidence to contradict Dooley's testimony. Moreover, Barnett described how dispatchers had to report their breaks to him, and that they were often deprived of a break. He also referred to the procedures for tracking the location and status of squad officers by computer—a system on which he had based the keeping of Warner's log. Barnett Dep. at 20–21. Barnett himself was similarly restricted in his ability to take a break without risk of being interrupted. Warner's subjective interpretation of the treatment she received under a new administration does not suffice to overcome the abundant evidence that every member of the police department had to make sacrifices on the job. She was not singled out.

■ For all these reasons, the Court finds that Warner has failed to supply enough evidence to ask a jury to decide whether she was subjected to a campaign of petty harassments in retaliation for her political support of the former mayor. Even if there were enough, the conduct Warner has alleged does not constitute the type of conduct that would deter a person of ordinary firmness from holding her political beliefs. She was not disciplined, threatened with discipline, reprimanded, or demoted, and she admits that she did not lose any pay as a result of the actions taken. Although she claims to have lost overtime pay when she was not asked to accompany a uniformed officer on a prisoner pickup run, Warner has offered no evidence to connect that decision to any action by Newport or Jenkins. She speculates that the explanation that she was a smoker was a pretext for discriminating against her because the officer took a civilian dispatcher who was also a smoker, and who did smoke on the way to get the prisoner.

Yet, the objection the officer had to Warner was that she was more senior to him and he did not believe she would honor his request that she not smoke, while DeHart had fewer years with the department and he believed she would refrain from smoking. Gilbert Aff. ¶¶ 5–6; Dooley Dep. at 54. Warner admitted that she had accompanied Gilbert in the past, and that she had smoked,

but she maintained that she would have honored his request had he asked. The issue is whether Gilbert believed she would, not whether she would in fact. It was his belief, even if it was mistaken but honestly held, that prompted his request for DeHart to accompany him. Warner's subsequent statement that she would have honored his request does not create a genuine issue of material fact. Nor has Warner demonstrated that she had any entitlement to being assigned to prisoner pick-ups, which means that she cannot show that she was deprived of any income to which she had a legal claim.

The Court finds that Warner has presented insufficient evidence to support a finding that any action taken against her would have deterred a person of ordinary firmness from pursing political activity. For all of these reasons, the motion for summary judgment on Warner's § 1983 claims against the City and against Jenkins and Newport should be, and hereby is, GRANTED.

### B. TITLE VII CLAIM

■ Warner claims that she was subjected to harassment because of her sex, which rendered her workplace environment hostile and abusive. By enacting Title VII, Congress attempted to pass a law that would prevent the perpetuation of stereotypes and the corresponding degrading of persons who share certain protected characteristics, both of which close off employment opportunities to those persons. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1483 (3d Cir.1990). The underlying purpose of Title VII was to remove artificial, arbitrary and unnecessary barriers to employment when those barriers operate to discriminate on the basis of race, sex or other protected characteristics. *Id.* The Supreme Court has held that Title VII is violated when a woman is subjected to a hostile environment created by severe and pervasive harassment because of her gender. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A plaintiff may successfully bring a sexual harassment claim under Title VII based on an alleged hostile environment by showing that the defendant's or its agent's conduct was "sufficiently severe or pervasive to alter

the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1043 (7th Cir.1994). Such a determination cannot be made by a "mathematically precise test," but instead is determined by looking at the totality of all the circumstances. *Hutchison*, 42 F.3d at 1043 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)).

In *Harris*, the Supreme Court developed a non-exhaustive list of factors to be considered when determining whether a workplace has been rendered hostile or abusive. *Dey v. Colt Const. Co.*, 28 F.3d 1446, 1453 (7th Cir.1994). Although all of the circumstances must be considered, courts are to pay particular attention to the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 114 S.Ct. at 371; *Dey*, 28 F.3d at 1453. These factors must be evaluated from both a subjective and an objective perspective. *Dey*, 28 F.3d at 1454.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.

*Id.* (quoting *Harris*, 114 S.Ct. at 370). Therefore, courts consider not only the actual effect of the conduct, but also the effect such conduct would have on a reasonable person in the plaintiff's position. *Id.* Relatively isolated incidents of non-severe misconduct will not suffice to support a claim of sexual harassment. *Saxton*, 10 F.3d at 533. But a series of offensive statements or misconduct, if sufficiently severe and pervasive, could constitute an objectively hostile environment. *Dey*, 28 F.3d at 1456.

Warner has not alleged or proven any conduct that occurred because of her sex. Instead, she has consistently attributed the alleged harassment to political motives of Jenkins and Newport. Even if she had claimed that the treatment she received was because of her sex, she has not come close to alleging or proving conduct that is sufficiently severe and pervasive to create a hostile or abusive environment. Warner was not subjected to any comments of a sexual nature, nor were there any incidents of vulgarity or offensive conduct. At most, she seems to argue that because she had to report to a male commander that she had to go to the bathroom, her workplace became hostile. As noted earlier, the defendants have demonstrated a business necessity for this rule, and Warner has offered no evidence to counter that showing.

Moreover, the Court has found that the treatment she received is no different than the treatment given to the patrol officers, both male and female, who must check in with the shift commander whenever they leave their vehicles. Dooley's and Barnett's testimony on this issue is undisputed. Although Warner has stated generally that no one else was subjected to such reporting procedures, Warner Aff. ¶ 15, she fails to show how she has personal knowledge of such a fact. Barnett specifically described how squad officers had to check in with him to report their whereabouts, and how he recorded that information on the computer. Likewise, the dispatchers reported to Barnett about when they were taking breaks or going to lunch. He could also observe them leaving, whereas he could not see Warner, which is why he asked that she call him. Similarly to the dispatchers, Warner was in a front-line position for providing service to the public, and when she was away from the desk, given the manpower shortage, there was no one to cover it for her. All of these reasons adequately explained the need for Warner to report her whereabouts to her shift commander. Warner has failed to create an issue of fact about whether the proffered explanations were a pretext for discrimination.

Nor has Warner pointed out any other evidence that her treatment was because of her sex. DeHart's deposition testimony that

Warner was treated worse by officers because she is a woman is disproved by De-Hart's own explanation for the events she described. DeHart Dep. at 54. According to DeHart, the other officers thought Warner had an easier job than they did, and that she received better treatment, so they treated her worse. *Id.* at 54–55. If true, these facts do not lead to the conclusion that Warner received worse treatment because of her sex. In sum, Warner has failed to adduce a genuine issue of material fact regarding any sex discrimination and the Title VII claim must fall to summary judgment.

### C. ATTORNEY FEES

 Federal law not only provides a remedy in damages to a successful plaintiff under § 1983, it also allows a court the discretion to award a reasonable attorney's fee as a part of costs. *See* 42 U.S.C. § 1988(b). To recover attorney fees, a party must first prove that he or she is the prevailing party in the litigation. *See Busche v. Burkee,* 649 F.2d 509, 522 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). A party "prevails when actual relief on the merits of [her] claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Simpson v. Sheahan,* 104 F.3d 998, 1001 (7th Cir.1997) (citing *Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). In addition, plaintiffs are deemed to have prevailed if they succeed in achieving from the litigation some of the benefit they sought in bringing suit. *Hastert v. Illinois State Bd. of Elec. Comm.,* 28 F.3d 1430, 1439, n. 10 (7th Cir.1993), 1439–40 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

 Given the Court's rulings on the defendants' summary judgment motion, Warner has not prevailed on her Title VII or her § 1983 claims. She argues, however, that she is entitled to attorney fees for filing this action demanding payment of the City's contribution for her to the 1977 Pension Fund, which resulted in her obtaining a portion of the relief she has requested. Plf's Brf. at 17. According to Warner, the "undisputed evidence is that the City ignored the July 1, 1996 effective date of Warner's pension and

forced her to file suit to obtain the relief she needed." Plf's Brf. at 17. She did not cite the evidence that she claims is undisputed on this point. Instead, she argues that when the City finally made a commitment to include her in the 1977 Pension Fund, after a one and one-half year delay, she had already filed suit. *Id.* at 17–18. This action was filed on February 5, 1997, and the decision to add Warner and the other police matron to the 1977 Pension Fund occurred in December of 1997.

Citing *Balark v. City of Chicago* for the proposition that "it is sufficient for a plaintiff to obtain a settlement or a consent decree in order to be a prevailing party," Warner argues that she need not have tried her case in order to prevail. Plf's Brf. at 18 (citing *Balark,* 81 F.3d 658 (7th Cir.1996)). Warner believes that the "very substantial change in her relationship with the City" occurred because she filed suit. Plf's Brf. at 19, citing "Warner Affidavit." Her subjective belief about what happened is not the test for determining prevailing party status. Nor can the Court conclude, on a *post hoc, ergo propter hoc* basis, that because the vote followed the inception of Warner's suit, the suit caused the favorable vote. Instead, to be considered a prevailing party, Warner must demonstrate that her suit was a catalyst of or material factor in the City Council's action. *See Board of Educ. v. Steven L.,* 89 F.3d 464, 469 (7th Cir.1996) (to be a prevailing party it is insufficient to show that but for the plaintiff's action the defendant would not have taken some desired action); *Hooper v. Demco, Inc.,* 37 F.3d 287, 292 (7th Cir.1994) (two-step analysis applies: 1) whether suit was a catalyst or material factor in obtaining favorable outcome from defendant; 2) whether suit prompted defendant to act based on strength of case and not "wholly gratuitously"); *Zinn v. Shalala,* 35 F.3d 273, 274 (7th Cir.1994) (noting that catalyst rule survived *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)).

Omitted from Warner's discussion, however, is any evidence of either a negotiated settlement or a consent decree that would definitively indicate a causal relationship between her suit and the desired outcome.

Nor has she presented any evidence that would disprove or dispute the City's evidence that it began to research the legality of and procedure for moving the matrons into the 1977 Pension Fund in April of 1996, almost one year prior to the filing of her suit. Def's Ex. 13; Jenkins Aff. ¶ 6. Apparently there was some doubt about whether matrons such as Warner, who were employed by city police departments, were eligible for police pensions. Jenkins Aff. ¶ 7. After an investigation by the city attorney, the City Council voted on or about December 11, 1997, to put the matrons in the police pension funds. *Id.* ¶ 14. The defendants' evidence, which Warner has not disputed, illustrates the deliberative legislative process involved in making this sort of a change. No evidence has been offered to show that the process was delayed for any reason other than to ascertain the legal eligibility of the matrons for the City's police pensions, and for determining the process with which to effect the change.

Warner argues that Jenkins and Newport opposed her participation in the police pension fund, and that such opposition was motivated by their intent to retaliate against her for her political activity. As noted earlier, she has very little evidence to support a finding that such motivation actually existed. Even if it did exist, it would not create an issue of fact about whether this litigation, as opposed to normal legislative processes, caused the City Council to adopt a resolution to include Warner in the police pension fund. At best, the opposing views of the mayor and chief of police were a part of the legislative process. Warner has failed to offer any evidence that would demonstrate that her suit was a catalyst for the City Council's action, in light of the fact that the City had already started the process before she filed suit.

 Moreover, when a suit alleging a § 1983 violation results in a settlement, consent decree or voluntary action on the part of the defendant in favor of the plaintiff, a court must first determine whether, regardless of the result, the lawsuit involved vindication of rights secured to the plaintiff by the Constitution or other federal law. *J & J Anderson, Inc. v. Town of Erie*, 767 F.2d 1469, 1475 (10th Cir.1985). In other words, a court must determine whether the plaintiff's lawsuit was not frivolous, unreasonable, or

groundless. *Id., Zinn*, 35 F.3d at 274. Warner has offered no evidence to assist the Court with this determination, ·other than to cite the change in the Indiana Code and conclusorily state that she was entitled to be in the police pension fund as of July 1, 1996. Even if this were true, Warner must prove some deprivation of a civil right with respect to the City's action of not deciding the issue until December of 1997. The Court has already found that she cannot offer sufficient evidence to support such a deprivation. For this reason, also, Warner cannot be found to have prevailed on a portion of the relief she sought and is not entitled to an award of attorney's fees under § 1988. She cannot prove that her suit caused the defendant to change its behavior, nor can she show that her suit was sufficiently strong to have prompted the defendants to act.

### D. PUNITIVE DAMAGES

 Warner has failed to support any of her claims with sufficient evidence to ask a jury to decide her case. Consequently, she likewise fails to support any punitive damages claim. Yet, she also would not be entitled to punitive damages against a municipality under either § 1983 or Title VII. She conceded this point in her brief. Plf's Brf. at 19. At most, she could seek punitive damages against Jenkins and Newport in their individual capacities, but to succeed she must offer proof of "conduct motivated by evil intent or callous indifference to [her]federally-protected rights." *See Stachniak v. Hayes*, 989 F.2d 914, 928 (7th Cir.1993). Warner has presented no evidence of an evil intent or callous indifference to her rights on the part of either Jenkins or Newport. Instead, she has offered her own subjective opinions about their motives, and hearsay comments and rumors. Her claim for punitive damages must fail.

### IV. CONCLUSION

Warner cannot produce sufficient evidence to create a factual issue about whether she was subjected to a campaign of petty harassment in retaliation for political activity, or that she was harassed because of her sex. She also has failed to show that she was

treated any differently because of her ethnic origin. The defendants' motion for summary judgment on the claims brought under § 1981, § 1983, and Title VII is **GRANTED**.

The claim that she is a prevailing party with respect to the pension status dispute is similarly unsupported and must fall to summary judgment. No punitive damages award would be appropriate in light of these rulings. The defendants' motion for summary judgment is **GRANTED** in full, with each party to bear its own costs.